Filed 3/23/16 Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>WILBERT BROWN,<br><br>     Defendant and Appellant. | A141172<br>(Contra Costa County<br>Super. Ct. No. 121946-8)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on February 25, 2016, be modified as follows:

1. On page 8, in the first full paragraph under the heading "Discussion," in the sentence beginning, "He points out, for example," the language, "it reasonably might have found that his punches were feckless, yet drew a severe and wholly unnecessary beating in response" is deleted. The deleted language is replaced with the following: "the jury could have found the officers unnecessarily initiated the violence by jumping on him and beating him as he lay prone on the ground, prepared to surrender."

2. On page 13, the first two sentences of the first full paragraph are deleted, along with the citation to *People v. Curtis (*1969) 70 Cal.2d 347, 355–356. The deleted material is replaced with the following paragraph:

1

As we have posited, the jury could have, on the one hand, believed Brown's testimony that he did not resist the officers before he fell or was pushed off his bike and was then tackled and slugged by Officer Moody while face-down on the ground, unresisting and ready to surrender—a scenario that would have made the arrest unlawful due to excessive force. The jury could still, on the other hand, have accepted the officers' testimony that Brown wheeled and repeatedly swung at them, striking both officers. If the jury concluded that Brown's reaction was unreasonable, that would have supported an assault conviction. "[W]hen excessive force is used by a defendant in response to excessive force by a police officer . . . defendant [may] be convicted, and then the crime may only be a violation of section 245, subdivision (a) or of a lesser necessarily included offense within that section," such as section 240. (*People v. White* (1980) 101 Cal.App.3d 161, 168; accord, *People v. Castain* (1981) 122 Cal.App.3d 138, 145 ["even if the officer is not acting within the scope of his duties because of his use of excessive force, the defendant may still be guilty of simple battery if he responds with excessive force"].) As Brown's counsel argued in his opening brief, if the jury found that Brown used unreasonable force in swinging at the officers it would have supported a conviction for "simple assault rather than forcible resistance to lawful police conduct under section 69. That view of the facts—i.e., that there was improper or excessive use of force on both sides—was frankly the most plausible interpretation of the evidence."

The next words following the insertion will be, "Thus, we conclude that the trial court erred," appearing in the original opinion at page 13. That sentence

2

shall end the paragraph and the following sentence, beginning with the words, " '[T]he failure to instruct sua sponte" shall begin a new paragraph.

3. On page 36, footnote 20: the sentence beginning, "Brown may have flailed reflexively at the officers," is deleted, as are the last two sentences of the footnote, beginning with the words, "As Brown's counsel argued in his opening brief," and ending with the words, "most plausible interpretation of the evidence."

There is no change in the judgment.

Respondent's petition for rehearing is denied.

Dated: _____          _____,

                                                                        P.J.

Filed 2/25/16 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILBERT BROWN,<br><br>    Defendant and Appellant. | A141172<br><br>(Contra Costa County<br>Super. Ct. No. 121946-8) |

**I.**

**INTRODUCTION**

In November 2011, Wilbert Brown was riding his bicycle on a sidewalk one evening in Richmond when Officer Michael Ricchiuto ordered him to stop for wearing earphones while riding, and for not having a light. Brown, who was 67 years old at the time, attempted to flee, but Ricchiuto and a second officer, Officer James Moody, chased him down and arrested him. After a physical altercation during the arrest, the officers restrained Brown and found drugs in a baggie he had discarded during the chase. Charges arising out of this incident resulted in felony convictions for possession and transportation of cocaine and for using force or violence to resist an executive officer in the performance of his duty in violation of Penal Code section 69 (section 69). Brown appeals, seeking reversal of his conviction for violating section 69 on two grounds: (1) the failure to instruct the jury sua sponte regarding simple assault as a lesser necessarily included offense, and (2) the erroneous admission of expert testimony regarding police standards for use of force. We agree with both contentions and shall conditionally reverse, finding that these errors, considered individually and cumulatively,

1

require either a modification or reversal of Brown's conviction for resisting an officer by force or violence.[1]

## II.

## STATEMENT OF FACTS AND PROCEDURE

A.    **Brown's Arrest on November 14, 2011:  The Officers' Version vs. Brown's Version**

The initial series of events leading to Brown's arrest was undisputed.  Near dusk on November 14, 2011, Officer Ricchiuto was on patrol in his cruiser in the Iron Triangle area of Richmond, a neighborhood known for drug trafficking and gang activity, often involving young African American men.  He spotted Wilbert Brown, a 67-year-old African American man, riding a bicycle on the sidewalk in violation of the Richmond Municipal Code, while wearing headphones and without a light in violation of the California Vehicle Code.  Officer Ricchiuto yelled at Brown to stop, but Brown sped up and tried to flee, with Officer Ricchiuto in pursuit.  Another officer, Officer Moody, who was backing up Ricchiuto in a second cruiser, joined in the chase and at one point wedged his car in front of Brown's path in an effort to cause a collision.  Brown managed to steer around Moody's car, grazing it and breaking a side mirror as he passed.  Both officers eventually left their vehicles and pursued Brown on foot.  The officers cornered Brown in an abandoned parking lot, where they arrested him after a brief altercation.  In the course of that altercation, Brown sustained a fractured rib and knots on his head, while Officer Ricchiuto sustained a "boxer's fracture" to the knuckle of his right hand.  At the time of their encounter with Brown, both officers were several decades younger

---

[1] Brown also seeks review of the denial of a pretrial motion for discovery of the personnel records of the officers involved in the incident pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).  Having reviewed the withheld personnel records, we affirm the trial court's denial of Brown's *Pitchess* motion.  On August 1, 2014, this court filed an order indicating that we had reviewed the sealed record of the *Pitchess* proceeding and found "that there are no discoverable documents under seal that should be produced to counsel."  In his opening brief, appellant requests a second review be conducted with the "benefit" of his factual summary and legal analysis.  The disposition we reach reaffirms our August 1, 2014 order.

2

than Brown (Ricchiuto was in his "late 20s" and Moody was 38), and in excellent physical condition. They were also physically much bigger than Brown (Brown was 5' 8", 140 pounds, while the officers were 6' 0'', 175 and 200 pounds respectively).

What happened in the parking lot when the officers caught Brown was a matter of some dispute.

According to the officers, at that point they had no idea how old Brown was. To them, he was a man they had never seen before, who was wearing baggy clothes, and who, by this stage of the chase, was suspected of felony drug trafficking. Officer Moody caught up to Brown first, yelled at him repeatedly to stop, and then tackled him, throwing him off of his bicycle, and taking him to the ground. Brown "aggressively" "flipp[ed] back over" into a "sitting position", and became combative, "swinging his hands" with a "clenched fist." To get control of Brown and protect himself, Officer Moody used his fist to hit Brown in the torso area with a "compliance strike," but the punch had no effect and Brown continued to swing at him; at that point, Officer Ricchiuto came to Officer Moody's assistance, and, seeing Brown reach for something in his waistband, delivered three "compliance strikes," one with his knee to Brown's torso, and two with his fists to the side of Brown's head. These blows caused Brown to stop swinging[2] and shield his head with his hands, a defensive move that finally brought him under control, since it allowed the officers to secure his hands and place him in handcuffs. Brown's account of the officers' actions was quite different. He testified that he fell off his bicycle in the parking lot after hitting a curb. He claimed that, without any kind of warning, and while he was face-down on the ground, not resisting and no longer fleeing, one of the officers dived on his back with enormous force, "like Superman," pinning him down. That officer, angry and unprovoked, then proceeded to slug him in the head three times. In

---

[2] Both officers were wearing bullet-proof vests. Officer Moody testified that Brown never succeeded in hitting him. Officer Ricchiuto testified that Brown hit him twice. Neither suffered injuries from what Officer Moody described as Brown's "flail[ing]" at them.

Brown's telling, all the second officer did was handcuff him after he had been pummeled by the first officer. Brown denied swinging at either officer. He testified, "I wouldn't even try to—I couldn't win anyway, but no, I didn't."

## B.    Expert Testimony

The prosecution presented the testimony of three experts to support its case, the first two to support the drug charges and the third to support the charge of resisting an executive officer with force or violence. Criminalist Richard Bowden testified as an expert in the area of analyzing controlled substances. Bowden was asked to examine a packet of 10 knot-tied plastic bags containing an off-white chunky substance that had been contained in the baggie Brown discarded. Bowden tested one of the bags and concluded it contained .219 grams of cocaine base. Bowden offered the opinion that the other packets, which contained substantially similar amounts of what appeared to be the same substance, were also cocaine. The total estimated net weight of the substance in all 10 bags was 1.799 grams.

Detective Miguel Castillo of the Richmond Police Department (RPD) testified as an expert on the subject of possession of cocaine base for sale. Castillo opined that when a person is carrying narcotics for sale rather than for personal use, he holds the drugs in individual use packages in order to make speedy transactions, maximize profits, and avoid carrying a scale. A "street-level dealer" also avoids having to use "pay/owe" sheets by packaging narcotics in a single dose amount, which is approximately .2 grams. When asked about a hypothetical suspect who was in possession of the amount and type of substances that Ricchiuto found when chasing Brown, Castillo opined that the drugs belonged to a street-level dealer who sells useable amounts of cocaine base.

Under cross examination, Castillo testified that a single dose of rock cocaine has an effect on the user for approximately 30 to 40 minutes and that the typical user may partake of this drug several times a day. In Castillo's experience, however, most users buy only one dose at a time, get high from it, and then go back to their suppliers for more, instead of simply buying several doses at one time. Castillo conceded that in the 15 cases

4

in which he had testified as an expert regarding possession of cocaine for sale, the amount of drugs in question was never as small as 1.7 grams.

Another RPD officer, Sergeant Albert Walle, provided expert testimony on the subject of police officer "defensive tactics." The prosecutor began her examination of Walle by asking about the legal authority of the police to use reasonable force. Walle testified that Penal Code section 835 authorizes the police to "use reasonable force when necessary when a public offense has been committed in order to effect an arrest, prevent an escape or overcome resistance." Walle also explained that the concept of "reasonable force" is defined in a 1989 Supreme Court case called *Graham v. Connor*.[3] When asked for the "general gist" of what reasonable force means, Walle stated: "Whenever you're using force, try to look at the totality of the circumstances through the perspective of the officer at the time who was using force, keeping in mind that the situation is fluid, evolving, and there's also various factors that come in that as well, too."

Walle testified that when officers have to use reasonable force their primary objective is to subdue suspects by overcoming their resistance and detaining them safely. The main factor affecting the officer's decision about what force to use will be the suspect's "resistance level" because the officer is going to be responding to what the suspect is doing. To teach officers how to respond appropriately, RPD employs a "use of force continuum," which consists of a ladder of escalation of resistance on one side matched against a ladder of escalation of force by the officer on the other side. Officers are taught not to look at an altercation as a "fair fight," but to employ a higher level of force than he or she faces: "You don't want to bring a baton to a knife fight, so you also want to be at least one level higher than what you're . . . encountering."

Walle outlined other important considerations for an officer who faces resistance from a suspect, which include the need to react and take control as quickly as possible to avoid fatigue; the importance of gaining control of the suspect's hands because of their potential to injure the officer; and the need to be attuned to movements toward the waist

---

[3] See *Graham v. Connor* (1989) 490 U.S. 386 (*Graham*).

area because it is common to keep a weapon there. Walle testified that an officer does not have "control" of a suspect until he or she stops resisting. The "tools" officers carry, Walle testified, include a gun, handcuffs, pepper spray, a taser, baton, and a flashlight. In addition, the officers are taught to use their "personal weapons," which include hands, forearms, elbows, knees and feet. Different tools are appropriate for different levels of force. Using body parts or a baton is considered "lower level force," while a taser is an "intermediate" level, and a firearm is the highest level of force.

The prosecutor asked Walle to address a hypothetical situation in which a suspect was using a closed fist to swing at and attempt to punch an officer. Walle characterized that hypothetical suspect as engaging in "assaultive" behavior. In that situation, officers are trained to use either personal body weapons, a taser, baton or pepper spray. Officers are also trained to provide assistance to an officer dealing with assaultive behavior because it is usually easier to gain control when another officer assists, and gaining control quickly is important for the safety of the officers as well as the suspect. Walle testified that "[m]ost use-of-force incidences happen within a matter of seconds, and they're constantly evolving and they're very dynamic, and an officer has to think on his feet very fast, and oftentimes doesn't have time—has to be very instinctive and a lot of it is responsive to training."

### C.     Jury Verdict and Sentence

The jury was instructed on two felony drug charges: possession for sale of cocaine base (Health & Saf. Code, § 13351.5); and transporting cocaine base (Health & Saf. Code, § 11352). It also received instruction regarding possession of cocaine base (Health & Saf. Code, § 11350), as a lesser offense of the possession for sale charge. The jury also was instructed on the charge that Brown violated section 69, the offense which is the subject of this appeal. Section 69, subdivision (a) states: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon the officer by law, or who knowingly resists, by the use of force or violence, the officer, in the performance of his or her duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to

6

subdivision (h) of Section 1170, or in a county jail not exceeding one year, or by both such fine and imprisonment."

Section 69 can be violated in two separate ways. " 'The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty.' " (*People v. Smith* (2013) 57 Cal.4th 232, 240 (*Smith*).) In this case, the jury was instructed about the second type of section 69 violation which requires the prosecution to prove the defendant knowingly resisted the officer " 'by the use of force or violence,' " and "that the officer was acting lawfully at the time of the offense." (*Id.* at p. 241.) At the request of both the prosecution and the defense, the jury was provided with the option of convicting Brown of misdemeanor resisting an officer during the lawful performance of his duties in violation of Penal Code section 148, subdivision (a) (section 148(a)), as a lesser included offense of the section 69 felony charge. The theory of Brown's defense to the section 69 charge was that the officers did not act lawfully when they arrested him because they used unreasonable and excessive force. The instructional guidance the jury received on this issue was CALCRIM No. 2670, which provides that "A peace officer may use reasonable force to arrest or detain someone, to prevent escape, to overcome resistance, or in self-defense."[4]

---

[4] Neither party requested a special jury instruction giving the jury further guidance as to what constitutes "reasonable force" under *Graham*. The CALCRIM No. 2670 instruction the jury received, however, did elaborate in another respect, providing guidance as to the lawfulness of an *arrestee's* conduct when confronted with unreasonable or excessive force by an officer. "If a peace officer uses unreasonable or excessive force while . . . arresting . . . a person, that person may lawfully use reasonable force to defend himself or herself," which is in turn defined as "that degree of force he or she actually believes is reasonably necessary to protect himself or herself from the officer's use of unreasonable or excessive force" and "no more force than a reasonable person in the same situation would believe is necessary for his or her protection." (CALCRIM No. 2670.) But the criteria by which to evaluate objective reasonableness— whether from a reasonable officer's perspective or from the arrestee's—were, in this case, left to the jury.

On October 4, 2013, the jury returned its verdicts, finding Brown not guilty of possession of cocaine base for sale, but guilty of the lesser included offense of possession of cocaine base; guilty of transportation of cocaine base; and guilty of using force or violence to resist an officer in the lawful performance of his duties in violation of section 69. Brown was sentenced in January 2014. The trial court granted a defense motion to dismiss the transportation conviction based on intervening legislation limiting that offense to transportation for sale. (See Health & Saf. Code, § 11352, subd. (c), added by Stats. 2013, ch. 504, § 1 (AB 721).) The court denied a defense motion to reduce the section 69 conviction to a misdemeanor, however, because Brown's decision to flee caused both property damage and personal injury (Brown's bike "wiped out" the mirror on the officer's patrol car, and the officer injured his hand because of the contact with Brown). After considering the relevant sentencing factors, the court placed Brown on three years felony probation with a suspended 120-day jail term as a condition of probation.

## III.

## DISCUSSION

### A.    The Instructional Error

#### 1.    *Issue Presented*

Framing the case as a choice between two starkly different scenarios, one recounted by the officers, or the other recounted by Brown, the Attorney General contends the jury chose the first, resolving a simple credibility contest in favor of the officers. That may be so, Brown responds, but by failing to instruct the jury on the lesser included offense of simple assault, the court never gave the jury the option of finding that both versions of the facts were partly true. He points out, for example, that even if the jury believed he swung at the officers, it reasonably might have found that his punches were feckless, yet drew a severe and wholly unnecessary beating in response. Without commenting on which version of events here was the more persuasive, we conclude that Brown's assignment of instructional error has merit, that the jury should have been given the option of finding him guilty of simple assault, and that he was prejudiced by the error.

8

As noted above, a violation of section 69 can occur in two circumstances. Under that section, a defendant commits a violation by attempting to deter an officer's lawful duty by violence or threat of violence. Alternatively, section 69 is violated where a defendant knowingly resists an officer's execution of lawful duty by actually using force or violence. (*Smith, supra,* 57 Cal.4th at p. 240.) Because the second ground for section 69 liability was the sole theory the prosecutor pursued at trial, the jurors were instructed that they could convict for violation of section 69 only if they found actual use of force or violence. At the request of both Brown and the prosecutor, the instructions gave the jury the option of finding Brown guilty of misdemeanor resisting an officer during the lawful performance of his duties as a lesser included offense of the section 69 charge. Under this lesser charge, the jury could have convicted Brown had it found that Brown resisted the officers' lawful performance of their duties, even if he did not use force or violence to effectuate that resistance. (See § 148(a).) Brown contends on appeal that the jury should have been given an additional option—convicting him of misdemeanor simple assault as a lesser included offense to a section 69 violation.

An assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code, § 240 (section 240).) An "assault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams* (2001) 26 Cal.4th 779, 790.) Brown asserts that a conviction for assault could have been supported by trial evidence that he used force to resist the officers under circumstances where the jury found the officers responded with excessive force, a factual scenario falling somewhere between the officers' version of events in the parking lot and that of Brown.

Brown concedes that he did not request an assault instruction, but he contends that the trial court had a sua sponte duty to instruct on assault as a lesser included offense of the section 69 charge. " 'California law has long provided that even absent a request, and

9

over any party's objection, a trial court must instruct a criminal jury on any lesser offense "necessarily included" in the charged offense, if there is substantial evidence that only the lesser crime was committed. This venerable instructional rule ensures that the jury may consider all supportable crimes necessarily included within the charge itself, thus encouraging the most accurate verdict permitted by the pleadings and the evidence.' [Citation.] '[T]he rule prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other. Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither "harsher [n]or more lenient than the evidence merits." [Citations.]' [Citation.] Thus, 'a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support.' " (*Smith*, *supra*, 57 Cal.4th at pp. 239–240.)

" ' "We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense. [Citation.]" ' [Citation.]" (*People v. Campbell* (2015) 233 Cal.App.4th 148, 158.)

### 2. *Analysis*

"Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117–118 (*Birks*).)

The question whether assault is a lesser necessarily included offense of section 69 is somewhat complicated by the fact that section 69 can be violated in two separate ways, as we explained earlier. A person can commit this felony either by (1) attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law, or (2) by knowingly resisting through the actual use of force or violence against an officer in the performance of his or her duty. (*Smith*, *supra*, 57 Cal.4th at p. 240.) A person can violate section 69 in the first way without necessarily attempting to apply

10

physical force. (See *In re Manuel G.* (1997) 16 Cal.4th 805, 817 [defendant can commit first type of offense prohibited by section 69 by threatening an officer in an attempt to deter officer from future performance of a duty].) Under this formulation, a person can violate section 69 without also violating section 240, which defines an assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." Therefore, as Brown concedes, section 240 is not a lesser included offense of section 69 under the statutory elements test.

Under the accusatory pleading test, however, we consider whether the facts alleged in the accusatory pleading include all the statutory elements of an assault. (*Birks*, *supra*, 19 Cal.4th at pp. 117–118.) Here, although the prosecutor's trial theory was that Brown committed the second type of section 69 violation, the first amended information was not so limited. It alleged that Brown violated section 69 not just by attempting to deter or prevent the officer from performing his duties (which can be accomplished without force), but *also* by knowingly resisting the officers with force and violence. Because the accusatory pleading used the conjunctive to charge Brown with both ways of violating section 69, and it is not possible to violate the statute in the second way without committing an assault, we conclude that assault was necessarily a lesser included offense of section 69 under the accusatory pleading test. (See *Smith*, *supra*, 57 Cal.4th at pp. 242–243 [§ 148(a) was necessarily a lesser offense of § 69 when accusatory pleading charged the defendant with both ways of violating § 69].)

The Attorney General concedes "[f]or purposes of this appeal . . . that section 240 was a necessarily included offense of section 69 as alleged in the amended information." But she nonetheless contends an assault instruction was not required in this case because there was no evidence that Brown's offense was less than the crime charged. "[I]nstructions on lesser included offenses 'are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.] "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed. [Citations.]' [Citation.]

11

Instructions on lesser included offenses should be given 'when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' [Citations.]" (*People v. Campbell*, *supra*, 233 Cal.App.4th at p. 162.)

Specifically, the Attorney General contends there was no evidence from which the jury could have concluded that Brown committed an assault without also violating section 69. She reasons that the jury was faced with a choice of either (1) crediting the prosecution evidence, which would establish that Brown forcibly resisted the officers *and* that the officers used reasonable force, or (2) crediting Brown's story, which would have established that the officers used excessive force *and* Brown was "completely unaggressive and defenseless." This reading of the record misconstrues the function of the jury in the truth seeking process. " 'Our courts are not gambling halls but forums for the discovery of truth.' [Citation.] Truth may lie neither with the defendant's protestations of innocence nor with the prosecution's assertion that the defendant is guilty of the offense charged, but at a point between these two extremes: the evidence may show that the defendant is guilty of some intermediate offense included within, but lesser than, the crime charged." (*People v. Barton* (1995) 12 Cal.4th 186, 196.) Thus, the jury was not required to choose and fully credit only one of the two versions of the November 2011 incident that were presented to it. For example, the jury could also have concluded that Brown used force or violence to resist arrest but that the officers nonetheless responded with unreasonable force. Under that scenario, Brown could have been found not guilty of the section 69 violation, but still guilty of the lesser crime of assault.

Alternatively, the Attorney General argues that the trial evidence established that the officers used reasonable force as a matter of law. Reasoning that Sergeant Walle's testimony established that the officers were legally entitled to use a level of force that was more than one level above the level of force used by the suspect, respondent contends that there is no evidence "in the record that would support a finding that the officers' conduct was anything *more* than one level above that employed by [Brown] or that it continued longer than necessary to gain control of [Brown]." The premise of this

12

argument—that Sergeant Walle's testimony was properly admitted—is incorrect for reasons we explain below, but even had the testimony been narrowly enough framed and appropriate for admission, the argument fundamentally misconceives the proper role of expert testimony in a case of this nature. Such testimony can never be used to define, as a matter of law, what constitutes objectively reasonable force or to decide whether it was used in a given case.

As we have posited, the trial evidence would substantially support a jury finding that, although Brown attempted to use force to resist arrest, the officers overreacted with excessive force and, therefore, were not acting within the scope of their duties. "[A] resisting defendant commits a public offense; but if the arrest is ultimately determined factually to be unlawful, the defendant can be validly convicted only of simple assault or battery." (*People v. Curtis* (1969) 70 Cal.2d 347, 355–356.) Thus, we conclude that the trial court erred by failing to instruct the jury regarding assault as a lesser necessarily included offense of the section 69 charge. " '[T]he failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility.' [Citation.] Under the state standard, 'such misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.' [Citations.] 'The Supreme Court has emphasized "that a 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*. [Citations.]" [Citation.]' " (*People v. Campbell*, *supra*, 233 Cal.App.4th at p. 165.) Under this test, we find a reasonable probability the error affected the outcome of this case. The use of excessive force was a primary defense theory at trial and there was substantial evidence to support it. But the instructional error precluded the jury from finding that the officers used excessive force, while convicting Brown of assault for swinging at the officers in a manner that could have injured them, whether he intended to cause injury or not. A "jury without an option to convict a defendant of a lesser included offense might be tempted to convict the defendant of an offense greater than that

13

established by the evidence instead of rendering an acquittal." (*People v. Eid* (2014) 59 Cal.4th 650, 658.)

Furthermore, this jury showed a readiness to scrutinize the evidence, draw its own independent conclusions of Brown's level of culpability, and convict on lesser charges than the prosecutor requested. The jury convicted Brown of a lesser included offense on the drug charge, for example, which is an indication that it had doubts about the prosecution's case which might also have affected its resolution of the section 69 charge. (See *People v. Mullendore* (2014) 230 Cal.App.4th 848, 857 [doubts leading jury to convict defendant of lesser offense of one charge could have led to a similar result on another charge for which it was not given that option].) Brown contends that the jury convicted him of simple possession rather than possession for sale because it had doubts about the credibility of the officers' story that Brown threw the bag of cocaine rocks under the parked car. Alternatively, that verdict may indicate that the jury drew different conclusions from expert evidence about possession of cocaine for sale than the prosecutor had intended. In any event, the jury could have had similar doubts about the section 69 charge. As discussed above, the defense argued that, even though Brown may have used force to resist arrest, the officers overreacted and administered a beating that was unreasonable and excessive. The instructional error precluded the jury from deciding whether to credit the substantial evidence supporting this theory.

The Attorney General's only harmless error argument is that the instructional error did not affect the outcome because "in convicting [Brown] of violating section 69 the jury showed it rejected [Brown's] claim of excessive force and found that the level of force used by the officers was at all times reasonable." But in assessing prejudice, "it does not matter that the jury chose to convict the defendant of the greater offense over acquittal or that the defendant was convicted of the greater offense on sufficient evidence." (*People v. Racy* (2007) 148 Cal.App.4th 1327, 1335–1336.) To hold otherwise would undermine the very purpose of the sua sponte rule. (*People v. Breverman* (1998) 19 Cal.4th 142, 178, fn. 25.) It does seem abundantly clear, however, as the Attorney General points out, that the jury found that Brown swung his fists at one

or more of the officers during the course of the arrest.  Whether these blows (or attempted blows) were effectual or not, we find substantial evidence to support an assault conviction.  "When a greater offense must be reversed, but a lesser included offense could be affirmed, we give the prosecutor the option of retrying the greater offense, or accepting a reduction to the lesser offense."  (*People v. Kelly* (1992) 1 Cal.4th 495, 528; see *People v. Hayes* (2006) 142 Cal.App.4th 175, 184.)  On remand we will provide the prosecution with the option of retrying the section 69 charge along with a charge of simple assault, subject to the guidance provided below in Part III.B.

### B.  Admission of Expert Testimony on Police Use of Force

#### 1.  *Principles Governing Admission of Expert Testimony Generally*

We review the trial court's ruling on the admissibility of expert testimony for abuse of discretion.  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).)  A ruling that constitutes an abuse of discretion has been described as one that is " 'so irrational or arbitrary that no reasonable person could agree with it.' "  (*Ibid.*)  But the trial court's discretion is not unlimited.  " 'The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ."  Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.  [Citation.] . . . [¶]  The legal principles that govern the subject of discretionary action vary greatly with context.  [Citation.]  They are derived from the common law or statutes under which discretion is conferred.'  [Citation.]  To determine if a court abused its discretion, we must thus consider 'the legal principles and policies that should have guided the court's actions.' "  (*Sargon*, *supra*, 55 Cal.4th at p. 773.)

The principles of law governing admission of expert testimony are well-settled. " 'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness . . . and to give testimony in the form of an opinion."  (*People v. Vang* (2011) 52 Cal.4th 1038, 1044; Evid. Code, §§ 720, 801.)  " 'Generally, the opinion of an expert is admissible when it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert

15

would assist the trier of fact . . . ." ' " (*Allgoewer v. City of Tracy* (2012) 207 Cal.App.4th 755, 761 (*Allgoewer*); see Evid. Code, § 801, subd. (a) [expert testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact"].)  However, " ' "[w]here the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates." ' " (*Allgoewer, supra,.* at p. 762.)  Expert testimony will be excluded " ' "when it would add *nothing at all* to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that men [and women] of ordinary education could reach a conclusion as intelligently as the witness.' " ' " (*People v. Jones* (2012) 54 Cal.4th 1, 60.)

Some topics are categorically off-limits to expert testimony.  (See Evid. Code, § 801, subd. (b) [caveat to admissibility where "expert is precluded by law from using such matter as a basis for his opinion"], § 802 [expert may state basis for opinion "unless he is precluded by law from using such reasons or matter as a basis for his opinion"].)  For example, juries are competent to decide such things as witness credibility (*People v. Wells* (2004) 118 Cal.App.4th 179, 189), a defendant's guilt or innocence (*People v. Torres* (1995) 33 Cal.App.4th 37, 46), or whether a crime has been committed (*id.* at p 47), without expert assistance in all circumstances.  Similarly, topics such as the definition of a crime (*id.* at pp. 45–46), the meaning of a statute (*id.* at p. 46), or other matters of law even if disguised as opinions about ultimate facts (*Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 865), always lie beyond the proper role of an expert.

### 2.  *Civil Cases Addressing Expert Testimony on Excessive Force Issues*

The use of excessive force by law enforcement officers is analyzed under the Fourth Amendment's objective reasonableness requirement for a seizure of the person (*Graham*, *supra*,  490 U.S. at pp. 388, 394–395; *Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 527 (*Brown*)), and usually arises in one of two contexts: (1)

16

defensively, as here, when an accused seeks to defend against a charge of resisting arrest or similar offense by contending the arrest was unlawful due to the officer's use of excessive force, and (2) offensively, when a person who claims to have been the victim of excessive force by law enforcement sues for damages under 42 U.S. C. section 1983 (section 1983), or similar state law remedy. The specific question of admissibility of expert testimony on use of force in the first of these situations has not been resolved in California. Rather, the few cases shedding any light on this question, in California and elsewhere, arise in the civil context, usually under section 1983. Because the rules of evidence governing expert testimony in California, in other states, and in the federal courts are broadly similar, at least insofar as is material here, it is worthwhile to preface our analysis of this issue of first impression with a review of the pertinent civil precedent decided by courts nationwide.

Summing up the state of the law across the country, one commentator recently observed that, although some courts allow excessive force expert testimony, "a larger number of courts have held that it is not required or not admissible." (Annot., Requirement for, and Admissibility of, Expert Testimony to Determine Whether Use of Particular Amount of Force in Course of Making Arrest Was Unreasonable (2015) 95 A.L.R. 6th 641, 649; *see id.* at §§ 3–10 [collecting cases].) Illustrative of the majority view, this commentator noted, is *Allgoewer, supra*, 207 Cal.App.4th 755, the leading California case to address expert testimony on issues of excessive force. Though not directly applicable here, *Allgoewer* serves as a helpful entry point to our analysis.

In *Allgoewer*, two police officers visited the home of plaintiff Allgoewer to investigate a complaint from Allgoewer's former wife that he was keeping the couple's son in violation of a child custody order. (*Allgoewer, supra,* 207 Cal.App.4th at p. 758.) Allgoewer became agitated while talking to the officers in his yard, and refused to drop a hand rake that he had been using. (*Ibid.*) The officers forced him to the ground, tased him twice, and wrenched his arms behind his back while arresting him, breaking his wrist and tearing muscles in his shoulder and bicep. (*Id.* at pp. 758–759.) In Allgoewer's civil suit against the officers for excessive force, the defense argued that he was required to

17

present expert testimony, drawing an analogy to medical malpractice cases. (*Id.* at pp. 759, 762.) The trial court found the argument persuasive and granted a non-suit motion. (*Id.* at p. 760.) Reversing, the appellate court began with a brief discussion of *Graham, supra*, 490 U.S. 386, the leading United States Supreme Court excessive force case involving non-deadly force. "Under *Graham,* . . . the question in a case such as this is whether the amount of force the officers used in making the arrest was objectively unreasonable given the circumstances they faced."[5] (*Allgoewer, supra*, 207 Cal.App.4th at p. 763.) Finding no California precedent directly addressing "[w]hether expert testimony is necessary to establish that a particular amount of force was objectively unreasonable" (*ibid.*), the court canvassed pertinent out-of-state authority, focusing on three cases, *Kopf v. Skyrm* (4th Cir. 1993) 993 F.2d 374 (*Kopf*), *Thompson v. City of Chicago* (7th Cir. 2006) 472 F.3d 444 (*Thompson*), and *Robinson v. City of West Allis* (Wis. 2000) 619 N.W.2d 692 (*Robinson*) (*Allgoewer, supra,* at pp. 763–764). From these cases, the court distilled the following: "[E]xpert testimony can be admissible on the issue of reasonable force" [*Kopf*], but is "not always admissible" [*Thompson*], and is

---

[5] In assessing reasonableness, the *Graham* test calls for consideration of at least three factors (which have come to be called the "*Graham* factors" in subsequent case law and academic commentary): (1) the severity of the offense for which the suspect was arrested, (2) the immediacy of the threat that the suspect posed to the officer or officers, and (3) whether the suspect was fleeing or actively resisting. (*Graham, supra*, 490 U.S. at p. 396.) "The most important of these is whether the suspect posed an immediate threat to the officers or others, as measured objectively under the circumstances." (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 712 (*Mendoza*).) Other factors may be significant in a given case (*Smith v. City of Hemet* (9th Cir. 2005) 394 F.3d 689, 701), since the "proper application [of the Fourth Amendment's reasonableness test] requires careful attention to the facts and circumstances of each particular case . . . ." (*Graham*, *supra*, 490 U.S. at p. 396.) Overall, however, the Court in *Graham* emphasized that the test of " 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," for "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving . . . ." (*Graham*, *supra*, 490 U.S. at pp. 396–397.)

certainly not "*required* in an excessive force case" [*Robinson*]. (*Allgoewer, supra*, 207 Cal.App.4th at p. 764, italics in original.)

Notably, the precise legal question addressed in *Allgoewer*—whether expert testimony is required from the plaintiff in a civil excessive force case—turns on a standard that differs significantly from the standard governing whether such testimony is admissible. For expert testimony to be admissible, it is not necessary that the subject of the testimony lie wholly beyond the understanding of the average juror, but merely that, even if the average juror has some knowledge of the topic, the expert might improve upon or refine the jury's common fund of information.[6] In cases where expert testimony is required, by contrast, the witness must have a degree of specialized knowledge that is peculiarly within the province of experts.[7] Of the three out-of-state cases *Allgoewer* mentions, only *Robinson* addressed the question of whether expert testimony is required. Finding persuasive the Wisconsin Supreme Court's observation in *Robinson* that " '[w]e cannot at once emphasize the jury's responsibility for applying the standard of reasonableness and also claim that the issue is beyond the jury's comprehension,' " *Allgoewer* rejected the argument that expert testimony is required in an excessive force case. " 'Requiring an expert as a prerequisite to a finding of use of excessive force,' " the court reasoned, " 'would essentially remove from the jury the task of applying standards of reasonableness and replace it with the task of evaluating the testimony of the parties' experts.' " (*Allgoewer, supra*, 207 Cal.App.4th at p. 765.)

---

[6] *People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1110 ("Because admissibility of expert opinion is a question of degree, and a jury need not be wholly ignorant of the subject matter under the statutory rule, exclusion is only necessary where the opinion would add nothing at all to the jury's common fund of information.").

[7] *Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 702 ("If the matter in issue is one within the knowledge of experts *only* and not within the common knowledge of laymen, it is necessary for the plaintiff to introduce expert opinion evidence in order to establish a prima facie case."), italics in original; see *Allgoewer, supra*, 207 Cal.App.4th at pages 761–762.

19

*Allgoewer* and *Robinson* both involved force that was primarily physical in nature without the use of weapons or special law enforcement tools. The officers in *Allgoewer* threw the arrestee to the ground and wrenched his arms behind his back (*Allgoewer, supra,* 207 Cal.App.4th at pp. 758–759), and the officers in *Robinson* punched the arrestee and slammed his face and body to the ground (*Robinson, supra,* 619 N.W.2d at p. 696). Having rejected the notion that there is any per se rule requiring expert testimony, the courts in both cases went further and determined there was no case-specific "need" for expert testimony on the facts presented. As the Wisconsin Supreme Court put it in *Robinson,* "there is no indication that the reasonableness of the officers' actions involves matters so complex as to necessitate an expert. One need not be an expert to determine whether a reasonable use of force in effectuating an arrest includes smashing an arrestee's face to the ground or landing a punch to the side of his head. . . . The difficulty a jury will have with this case lies not in applying the reasonableness standard to the facts as it finds them but in untangling the disputed facts presented by the parties." (*Robinson, supra*, 619 N.W.2d at pp. 700–701.) This secondary inquiry into whether excessive force expertise was "needed" on the facts presented is roughly analogous to whether proffered expert testimony will add anything to the knowledge of the average juror, but because the root question in *Allgoewer* and *Robinson*—whether expert testimony should be mandatory versus whether it should be admissible—differs from the one presented here, *Thompson* and *Kopf*, the other two cases discussed in *Allgoewer*, are more directly relevant to this case. Both *Thompson* and *Kopf* address admissibility.

In *Thompson*, two officers saw what they suspected was a drug buy take place between the driver of a parked black Mustang and a man who approached him. They tailed the Mustang for a few blocks and then tried to pull it over for a traffic stop. The Mustang at first pulled over, but then suddenly sped up and tried to get away, leading the officers and several others who joined them on a high-speed chase that ended with the Mustang crashing. Eventually, seven officers arrived at the scene of the crash, where the driver of the car, James Thompson, 6' 2", 330 pounds, got out of the car and began

aggressively resisting their efforts to arrest him, swinging at them with his fists. Thompson was tackled to the ground, and while on the ground face down, one officer, Officer Hespe, sat on his back and placed him in a choke-hold, while the other officers handcuffed him. The chokehold collapsed Thompson's air passages, and he suffocated to death. (*Thompson, supra,* 472 F.3d at pp. 447–448.) In the ensuing civil suit under section 1983 against the officers, only Officer Hespe remained as an individual defendant when the case went to trial, and the defense moved in limine prior to trial to exclude the testimony of two experts proffered by the plaintiffs. According to the plaintiffs' proffer, the experts would have opined that Officer Hespe did not adhere to his training and used a chokehold in violation of his department's use-of-force policy. (*Id.* at pp. 449–450.)

The trial court granted the motion in limine, and excluded the testimony. Affirming that ruling on appeal, the Seventh Circuit Court of Appeals noted that, under *Graham*, "What constitutes 'reasonableness' with regard to an officer's actions in apprehending a suspect under the Fourth Amendment is ' "not capable of precise definition or mechanical application" but "requires careful attention to the facts and circumstances of each particular case . . . ." ' " (*Thompson*, *supra*, 472 F.3d at p. 454 (quoting *Graham, supra,* 490 U.S. at p. 396).) The court then looked to *Whren v. United States* (1996) 517 U.S. 806, 815–816, where the United States Supreme Court rejected the use of police manuals and standard procedures to evaluate what a "reasonable officer" would do under the Fourth Amendment in the context of a traffic stop. Summarizing *Whren, Thompson* observed that "police rules, practices and regulations vary from place to place and from time to time," and as a result, "are an unreliable gauge by which to measure the objectivity and/or reasonableness of police conduct" under the Fourth Amendment. (*Thompson, supra,* at p. 455.) Accordingly, *Thompson* concluded, "Introducing two experts to testify that Officer Hespe used excessive force would have induced the jurors to substitute their own independent conclusions for that of the experts." (*Id.* at p. 458.)

*Kopf* was another case involving the use of various forms of physical force, which included the use of a trained police dog. In that case, a man and a woman, Anthony

Casella and Tammy Obloy, were suspects in the robbery of a pizza parlor. A team of police officers chased them, at first by car, and then, eventually, on foot, catching up to them in an area behind a garage, where the suspects tried to hide in a narrow passageway between two buildings. The officers released a police dog into the passageway, where it mauled both Casella and Obloy, despite cries from Obloy not to let the dog attack her because she was pregnant. The officers eventually dragged the suspects out of the passageway, with the dog continuing to bite at Casella. They testified that, once Cassella was freed from the passageway, he lunged at them. In response, an officer struck Casella multiple times in the head with a flashlight until it broke, and then with a slapjack. Casella suffered multiple lacerations from the dog bites and permanent brain injury from the blows to his head. (*Kopf, supra,* 993 F.2d at pp. 375–376.) At the trial of a subsequent section 1983 case brought by Cassella's personal representative (he had since died in an unrelated incident), the officers testified that in making the arrests they simply followed their training. In rebuttal, the plaintiffs sought to offer the expert testimony of a use-of-force expert who proposed to testify that the officers, in fact, violated departmental use-of-force policy and did not follow their training. (*Id.* at pp. 376–377.)

The trial court excluded the plaintiff's expert, and on appeal a panel of the Fourth Circuit Court of Appeals reversed. (*Kopf*, *supra*, 993 F.2d at p. 375.) The Court of Appeals faulted the trial court for applying what appeared to be "a blanket rule that expert testimony is generally inappropriate in excessive force cases . . . ." (*Id.* at p. 378.) "The facts of every case will determine whether expert testimony w[ill] assist the jury. Where force is reduced to its most primitive form—the bare hands—expert testimony might not be helpful. Add handcuffs, a gun, a slapjack, mace, or some other tool, and the jury may start to ask itself: what is mace? what is an officer's training on using a gun? how much damage can a slapjack do? Answering these questions may often be assisted by expert testimony. [¶] A dog is a more specialized tool than a gun or slapjack. How to train a poodle to sit or roll over is not everyday knowledge and could be explained by an expert in a case where it was relevant. How to train and use a police dog are even more obscure skills." (*Id.* at p. 379.) Looking with close scrutiny at each type of force used,

22

the court found it was an abuse of discretion not to allow expert testimony concerning the officers' training and use of police dogs and slapjacks because these tools involved enough special knowledge to warrant expert explanation. (*Ibid.*)

*Hygh v. Jacobs* (2d Cir. 1992) 961 F.2d 359 (*Hygh*), another civil excessive force case involving physical blows to a suspect, is relevant here as well. There, in the course of an arrest for disorderly conduct, Officer Jacobs slugged William Hygh in the face, fracturing three cheek-bones. Jacobs claimed he hit Hygh with his fist in self defense. (*Id.* at p. 361.) At trial in a section 1983 case seeking damages for excessive use of force, Hygh presented a medical expert who opined, based on the extent of the injuries, that Jacobs struck Hygh with "a blunt instrument of some sort." (*Ibid.*) Since Jacobs admitted he was carrying a flashlight that night, Hygh also presented a law enforcement expert who testified that if Jacobs used the flashlight to strike Hygh rather than a fist, the extent of force used was objectively unreasonable because the use of such a blunt instrument met the legal definition of "deadly physical force." (*Id.* at pp. 361–362.) On appeal from a jury verdict in favor of plaintiff Hygh, the Second Circuit Court of Appeals held that it was error to permit the expert to address legal matters, even though he did not directly tell the jury how it should decide the case. "Even if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness," the court held, "the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury. [Citations.] Whereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury." (*Id.* at p. 364). In the end, however, the appellate court affirmed. After observing that the trial court had instructed the jury on the same matters Hygh's expert addressed, and that the difference between the expert's version of law and the trial court's was "not substantial" (*id.* at p. 364), the appellate court found the law enforcement expert's testimony was erroneously admitted, but was not prejudicial, although it did remark that the "question is close" (*id*. at pp. 364–365).

While some of these cases are more directly applicable than others, each of them is to some degree instructive. Broadly speaking, *Allgoewer*, *Robinson, Thompson* and

23

*Kopf* all view the utility of expert testimony in civil excessive force cases through a common frame of reference. Within that frame, the correct analysis is case-by-case and very much dependent on the particular facts presented, but in general, where only bodily force is used, the less likely it will be that an excessive force expert will add something to the common store of knowledge that every jury brings to its task. Since the ultimate issue for a jury to decide under *Graham* is whether the challenged conduct is objectively reasonable, the training of particular officers—which focuses subjectively on how *they* were predisposed to handle the situation they faced—is, at best, only marginally relevant. What counts is whether a reasonable officer, faced with the same set of circumstances, would have chosen the same course of action. *Hygh* adds the refinement that, even where an expert does not address the ultimate issue for decision by a jury, legal guidance on what constitutes objectively reasonable conduct must come from the trial judge, not from the expert.

### 3. Analysis

#### a. The Threshold Issue of Form

The Attorney General acknowledged at oral argument that expert testimony from the prosecution on the issue of excessive force is "unusual" on a section 69 charge. It is indeed unusual, and was here, both for the substance offered and the way in which it was presented. In the course of his testimony, Sergeant Walle opined at one point that, taking the officers' version of events as true, Brown had engaged in "assaultive" conduct, justifying the force the officers used in response, but for the most part his testimony was presented as a general overview of the applicable law and the "defensive tactics" course that he teaches to all officers in the RPD. The purpose of this tutorial was never made clear to the jury, but the prosecutor did explain to the court—though not to the jury—that she was concerned jurors could "get the wrong impression" about the aggressive tactics these officers employed to subdue a fleeing 67-year-old: "[W]hen there's a struggle, especially with more than one officer, juries can get the wrong impression that . . . they're ganging up on him," and when "there's a knee strike to the ribs . . . which then is

24

followed by a punch, which is essentially a distraction blow, can seem [¶] . . . [¶] excessive. But they are trained to use . . . these . . . tactics to get someone under control."

The Evidence Code presupposes the presentation of expert testimony in the form of reasoned opinions.[8] That has the salutary effect of ensuring some degree of logical rigor, which not only allows the foundation for an expert's opinion to be properly screened for reliability (see *Sargon, supra,* 55 Cal.4th at p. 769 ["[u]nder California law, trial courts have a substantial 'gatekeeping' responsibility" to screen expert testimony for admissibility]), but once past that threshold screen, helps keep its presentation to the jury focused on subject matter circumscribed by its rationale for admission.[9] The form of

---

[8] See Evidence Code section 801, subdivision (a) ("If a witness is testifying as an expert, his testimony in the form of *an opinion* is limited to such *an opinion*" as is "sufficiently beyond common experience that *the opinion* of an expert would assist the trier of fact"), italics added; Evidence Code section 801, subdivision (b) (expert testimony must be based on matter "that is of a type that reasonably may be relied upon by an expert in forming *an opinion* upon the subject to which his testimony relates"), italics added; Evidence Code section 802 ("A witness testifying in the form of *an opinion* may state on direct examination *the reasons for his opinion* and the matter . . . upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his *opinion.* The court in its discretion may require that a witness before testifying in the form of an *opinion* be first examined concerning the matter upon which his *opinion* is based."), italics added.

[9] A pair of federal cases, both from the Sixth Circuit Court of Appeals, illustrate the importance of ensuring at the "gatekeeping" stage that proposed testimony from a police practices expert is specifically focused on matters within the expert's qualifications. In *Berry v. City of Detroit* (6th Cir. 1994) 25 F.3d 1342 (*Berry*), the plaintiff in a section 1983 excessive force case presented a retired police officer witness with expertise in police "defensive tactics." (*Id.* at p. 1349.) The trial court found the witness qualified to testify as an expert, and on the strength of his testimony about what he described as deficient use-of-force training and disciplinary practices, a jury awarded a large damage verdict. (*Id.* at pp. 1343–1344, 1348–1349.) Reversing, the Sixth Circuit Court of Appeals held the expert's testimony should have been excluded as unreliable. (*Id.* at pp. 1348–1354.) "[T]here is no such 'field' as 'police policies and practices.' . . . [T]here was no foundation at all for discipline testimony, even though it would fall under the general label of 'police policies and practices[,]' . . . [a phrase that] is so broad as to be devoid of meaning. It is like declaring an attorney an expert in the 'law.' " (*Id,* at p. 1352.) More recently, the Sixth Circuit, in another section 1983 excessive force case,

25

presentation here observed no such boundaries. Even assuming it was proper for the prosecution to present Sergeant Walle's testimony in the form we see here—no objection having been interposed on that ground—the substance of the testimony should nevertheless have been excluded. Because Sergeant Walle's testimony (i) added nothing to the common fund of information that any juror would have brought to the jury room, and (ii) inaccurately addressed the governing law, he, in essence, invited the jury to abdicate its duty to decide the issue of excessive force based on an erroneous understanding of the law. Brown's motion in limine seeking exclusion of the testimony should therefore have been granted.

b.        Specialized Knowledge

For the jury to sort out what happened here, specialized knowledge was not required. Because these officers used "force . . . reduced to its most primitive form—the bare hands" (*Kopf, supra*, 993 F.2d at p. 379), this was not a case in which the proper handling of some specialized law enforcement tool (e.g. a gun, a dog, a taser, mace, pepper spray) had to be explained. It may be to these officers' credit that they chose to use only physical force, but an expert was not required to make that elementary point. Nor was it a matter of specialized knowledge that two officers are more effective than one; that a second officer may come to the aid of another officer who is having trouble subduing a suspect; or that, to gain control over a resisting suspect, law enforcement officers are permitted to use their hands, fists, knees, feet or other body parts. The question here was not whether two officers could join in the pursuit of Brown or use bodily force against him, but whether they went overboard when they caught him. On

distinguished *Berry*, explaining, "We did not hold that an individual cannot ever testify as an expert about some aspect of police affairs. Rather, the holding in *Berry* reasoned that unqualified individuals could not broadly testify about an area in which they possessed no specialized knowledge." (*Champion v. Outlook Nashville, Inc.* (6th Cir. 2004) 380 F.3d 893, 908 (*Champion*). Because the expert in *Champion* focused his testimony on a "discrete area of police practices about which he had specialized knowledge," (*id.* at p. 909) the court found no abuse of discretion in the admission of the testimony of a police practices expert. (*Id*. at pp. 908–909.)

26

this crucial question of proportionality, technical jargon ("pain compliance," "personal weapons," "control techniques") and truisms about the amount of force officers may use (enough to ensure that their target cannot engage them in "a fair fight") add nothing to the everyday understanding anyone would bring to the jury room.

In a different criminal context but one also raising the issue of the admissibility of expert testimony on matters for jury determination under a legal standard of objective reasonableness, the court excluded testimony from an expert in *People v Czahara* (1988) 203 Cal.App.3d 1468 (*Czahara*). In that case, the defendant shot his ex-girlfriend and her new boyfriend, and was then convicted of multiple attempted murder convictions. (*Id.* at p. 1471.) Claiming that he reacted to provocation, the defendant called a psychiatrist as an expert witness who, according to an offer of proof, would have testified that "the ordinarily reasonable person in the same circumstances would also have acted in passion." (*Id.* at p. 1476.) This testimony, the defendant argued, was relevant to the objective, reasonable person component of his heat of passion defense. (*Id.* at p. 1477.) Affirming the trial court's exclusion of the testimony, the appellate court ruled that "the adequacy of provocation is not a subject sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*Id.* at p. 1478.)

The *Czahara* court explained, "the reasonableness of [the defendant's] reaction is left to the jurors precisely so that they may bring their common experience and their own values to bear on the question of whether the provocation partially excused the violence. . . . While courts have frequently held certain categories of provocation adequate or inadequate as a matter of law, the modern tendency is to leave the jury free to apply community norms to the question. [Citation.] [¶] Psychologists, psychiatrists or sociologists may have specialized empirical knowledge regarding the range of reactions to a given provocation, . . . [b]ut this information would not materially assist the jury in its task; the jury must determine not only if the reaction is ordinary but if it is reasonable . . . ." (*Czahara, supra,* 203 Cal.App.3d at p. 1478.) The ultimate determination of reasonableness, the court held, "depends more on (perhaps unarticulated) community norms" than on any empirical knowledge the expert could have supplied. (*Ibid.*; see

27

*Burton v. Sanner* (2012) 207 Cal.App.4th 12, 14 [expert "usurped the jury's role" where "[t]he test of reasonableness" on an issue of self defense was "an objective one for the jury" and "it is just as competent as the expert to evaluate the evidence and draw conclusions"].)

Similarly, here, it was important for a jury to apply a reasonableness standard using its common knowledge. Once the jury determined that some use of force was appropriate in subduing Brown, its task was to determine whether these officers overreacted to the circumstances. To guide that assessment, *Graham* lays down a broad test highlighting certain factors for consideration, all to be viewed from the standpoint of the officer in the field. (*Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334, 343.) At the end of the day, however, the " '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . .' " (*Graham*, *supra*, 490 U.S. at p. 396, quoting *Bell v. Wolfish* (1979) 441 U.S. 520, 559.) It is highly situational and fact-specific, and in applying the test, the jury's task not only permitted but required it to apply its own independent sense of reasonableness, using whatever community norms jury members might bring to the issue.

c.      Expert Testimony on the Law

"There are limits to expert testimony, not the least of which is the prohibition against admission of an expert's opinion on a question of law." (*Summers v. A.L. Gilbert Co*. (1999) 69 Cal.App.4th 1155, 1178.) Embedded in Sergeant Walle's overview of his mandatory "defensive tactics" training course was an explanation of the governing law. At the start of Sergeant Walle's examination, the prosecutor posed a series of direct questions about the law, asking him "what does the law state is a reason for an officer to use force?" and "[h]ow is reasonable force defined?" Sergeant Walle responded that the legal authority for an officer's use of force is "835(a) of the Penal Code" and explained that all RPD officers are given training founded on *Graham v. Connor*.[10]

---

[10] The Attorney General argues that Brown failed to preserve any specific objection to Sergeant Walle's testimony about the law. But this is not a case in which the appeal raises " 'a *wholly different basis* of exclusion' " than the trial objections. (Cf.

28

Sergeant Walle then summarized his understanding of *Graham* for the jury, but provided a truncated explanation, partially mentioning only one of the three factors the Supreme Court held should be taken into account in assessing reasonableness—whether the suspect is actively resisting or fleeing—never mentioning that the test is an objective one, and repeatedly emphasizing "the law says you're supposed to put yourself in the shoe[s] of an officer at the time of the incident . . . because it is fluid and ever changing[.]" The jury instructions in this case did not address *Graham*. As noted above, the court instructed the jury using CALCRIM No. 2670, which advised it that "A peace officer may use reasonable force to arrest or detain someone, to prevent escape, to overcome resistance, or in self-defense," but beyond that, it gave no instruction explaining the criteria for the jury to use in distinguishing "reasonable" from "excessive" force. Sergeant Walle supplied the jury's only legal guidance on this crucial issue, and the two "*Graham* factors" he omitted—the severity of the crime for which the suspect was being sought, and the immediacy of the threat the suspect posed—were both potentially important here.

The Attorney General points out that Sergeant Walle discussed the law only briefly, by way of background explanation. The testimony may have been brief, but it was powerful. Clearly, the jury focused on it. Perhaps not surprisingly, since the jury had no other source of legal guidance on this key legal issue—by contrast to *Hygh*, where an expert merely echoed the trial court's instructions—it asked for a read-back during deliberations of the "testimony of [Sergeant] Walle regarding training of police officers, specifically regarding compliance strikes *and reasonable vs excessive force* . . . i.e. need

---

*People v. Williams* (1988) 44 Cal.3d 883, 907, fn. 6.) Brown objected to Sergeant Walle's testimony in its entirety, and in support of that objection he argued that Sergeant Walle's testimony contained no specialized content and invaded the province of the jury. Because the prejudicial impact of admission of Sergeant Walle's testimony over these objections—both of which were well taken—was bound up with his testimony on the law, the grounds for objection asserted by Brown were sufficient to "fairly inform the trial court . . . of the specific reason or reasons the objecting party believes the evidence should be excluded." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

his entire testimony other than his introduction." (Italics added.) Thus, even though Sergeant Walle did not in terms advise the jury how to decide the ultimate issue, he did manage to provide it with a legal standard for decision, thereby vesting himself with authority as a source of legal knowledge. Summing up the problem with expert testimony of this sort in *Hygh*, the Second Circuit Court of Appeals explained: " 'The danger is that the jury may think that the 'expert' in the particular branch of the law knows more than the judge—surely an inadmissible inference in our system of law.' " (*Hygh, supra,* 961 F.2d at p. 364, quoting *Marx & Co., Inc. v. Diners' Club Inc.* (2d Cir. 1977) 550 F.2d 505, 512.)

As in *Burton, supra*, 207 Cal.App.4th 12, which also involved a police expert's testimony on use-of-force training (including such matters as "pain compliance" and the "use-of-force continuum"), "the court essentially allowed [Sergeant Walle] to instruct the jury on his view of applicable legal principles and standards, even though he is unqualified to do so . . . ." (*Id.* at p. 23.) Like his counterpart in *Burton*, Sergeant Walle "has impressive credentials as an educator and authority figure" with RPD. (*Id.* at p. 24.) Indeed, in addition to training other officers on "defensive tactics," proper use of "pain compliance" techniques, and the like, Sergeant Walle was an investigator in the Internal Affairs Unit and currently sits on RPD's Use of Force Board, where he evaluates the reasonableness of RPD officers' actions on a day-to-day basis. In view of those credentials, the jury had every reason to look to him as a far better judge than they could be of the reasonableness of those officers' tactics.

The prosecutor was, of course, entitled to ensure the jury understood "there will virtually always be a *range* of conduct that is reasonable" (*Brown*, *supra*, 171 Cal.App.4th at p. 537, italics in original), and that " ' "[t]he Supreme Court's definition of reasonableness is . . . "comparatively generous to the police. . . .' " [Citation.]' " (*Id.* at p. 528, quoting *Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1103 (*Munoz*), disapproved on other grounds in *Hayes v. County of San Diego* (2013) 57 Cal.4th 622), but if she wished to emphasize these points, she was fully entitled to do so by requesting a special jury instruction on the *Graham* factors and then elaborating on

30

that instruction in closing argument.[11]  While counsel is expected to present argument anchored in the law, fairly read, the fact that an expert does so, and does so based on an inaccurate rendition of the law, is an indication he has improperly stepped outside his role as adjunct to the fact finder.  (See *Burton*, *supra*, 207 Cal.App.4th at p. 24 [reversing and finding miscarriage of justice where an expert tried to do what an advocate could not and improperly testified that "he turns down most court cases offered to him, and he only takes a case if he 'wholeheartedly and truly believe[s] in the case itself' "].)[12]

   d.  Invasion of the Province of the Jury

 Emphasizing that Officer Walle did not opine on the ultimate issue of reasonableness, the Attorney General points out that "it was still up to the jury to decide whether the officers' actions in this case conformed to their training" and that "[t]he jury's verdict suggests . . . it found that the officers' use of force was consistent with their training."  Her framing of the issue is telling.  Putting to one side that the defense never contested the officers were properly trained,[13] this line of argument highlights why the

---

[11] *Munoz, supra*, 120 Cal. App.4th at page 1110 ("The quotation directing the jury that the test of reasonableness 'is not one of 20/20 hindsight, but one which necessarily allows for the fact that police officers are often forced to make split-second decisions in circumstances that are tense, uncertain, and rapidly evolving with the amount of force which is necessary' was taken directly from case law [citation] and is a correct statement of law. Although not appropriate as an instruction from the court, there was nothing wrong with these statements as part of closing argument.").

[12] This illustrates how the open-ended form of much of Sergeant Walle's testimony created other problems.  Sergeant Walle obviously was not and could never have been qualified as an expert in the law.  But because his testimony was not presented in a way that ensured he would address only a "discrete area of police practices about which he had specialized knowledge" (*Champion, supra*, 380 F.3d at p. 909; see fn. 9, *ante*), he managed to roam beyond his demonstrated area of expertise by folding his testimony on the law into his training course tutorial.

[13] In closing argument, Brown's contention was not that Officers Moody and Ricchiuto were poorly trained or incompetent, but that they made a mistake when they perceived him as a threat, that they overreacted to the situation and beat him up in retaliation for his defiance, and that their testimony about him swinging at them was fabricated to cover up their mistake.

testimony should have been excluded, not why it should have been admitted. It concedes the thrust of Brown's argument for exclusion—that the true purpose of Sergeant Walle's testimony was not to educate the jury about control techniques they would otherwise have had difficulty understanding, but instead to suggest that, because Officers Ricchiuto and Moody conducted themselves "by the book," in accordance with legally sanctioned training, what they did was therefore within the bounds of the law. In effect, Brown argues, Sergeant Walle's testimony was an invitation to avoid the question of excessive force altogether by conflating it with whether the officers did as they were trained to do. He is correct, in our view.

The Attorney General also contends that the training testimony could have cut both ways, since "if the jury found that the officers' actions were inconsistent with their training it would tend to support the argument that the force used was unreasonable." But the idea that RPD's training regimen can serve as a valid Fourth Amendment benchmark for reasonableness—available for either side to argue—rests on the premise that the officers' training *itself* is reasonable. We have no reason to doubt that premise as a matter of law enforcement policy, but by placing the issue before the jury, the court opened up a line of inquiry that was potentially distracting and confusing.[14] As Brown's counsel put the issue in support of his motion in limine, "Whether the officers are trained

---

[14] Brown points out that in the wake of a series of high profile controversies involving use of force by police officers in different parts of the country, a number of law enforcement agencies have adopted reforms to their use-of-force training. (See Apuzzo, Police Rethink Long Tradition on Using Force, N.Y. Times (May 5, 2015) p. A1; see also Michelle E. McStravick, *The Shocking Truth: Law Enforcement's Use and Abuse of Tasers and the Need for Reform* (2011) 56 Vill. L. Rev. 363, 384–385 [pointing out that the Federal Law Enforcement Training Center (FLETC), the national training institute that developed the use-of-force continuum, has made clear that, because of the formulaic nature of the continuum, it "directly conflicts with" *Graham*'s conception that " 'reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application' ", and as a result, FLETC has "done away with the use-of-force continuum" in its own training materials, although many law enforcement agencies around the country still use some form of the continuum in their training programs.].)

this way or not doesn't necessarily make physical action reasonable." Reasonableness for Fourth Amendment purposes was for the jury to decide based on the facts of Brown's encounter with Officers Moody and Ricchiuto, not by using the officers' training as a proxy for it. Presented with the same line of argument the Attorney General makes here, the *Thompson* court explained: "It may be that" adherence to local training rules might be of interest to those "making discipline, promotion or salary decisions," but "that information was immaterial" in this trial. (*Thompson, supra*, 472 F.3d at p. 455.) Because introducing an expert to address the issue of training "induced the jurors to substitute their own independent conclusions for that of the expert[]" (*Thompson, supra*, 472 F.3d at p. 458), the court excluded testimony about officer training as more time consumptive and confusing than probative under Federal Rule of Evidence 403 (the federal counterpart to Evidence Code section 352) (*id.* at p. 453).

The balance of probative value versus potential to confuse and distract illustrates a key difference between this case and the civil cases addressing the admissibility of testimony from a police training expert on excessive force issues. In general, the scope of relevant subject matter implicating issues of excessive force tends to be broader in civil cases than it is in criminal cases, and as a result, the probative value of testimony from an excessive force expert is typically stronger there. In section 1983 cases, for example, the contested issues may include an officer's good faith as part of a qualified immunity defense,[15] agency liability based on alleged excessive use of force pursuant to official policy,[16] or supervisorial liability under a deliberate indifference theory.[17] And in

_____

[15] *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 839–840 (recognizing availability of qualified immunity defense to section 1983 claims asserted in the California courts); see *Mendoza, supra*, 206 Cal.App.4th at page 711; *Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334, 342 (*Martinez*).

[16] *Blankenhorn v. City of Orange* (9th Cir. 2007) 485 F.3d 463, 484 (*Blankenhorn*) ("Blankenhorn seeks to hold the City liable for the arresting officers' alleged use of excessive force. The City may be held liable under section 1983 if its deliberate policy caused the constitutional violation alleged."); see *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658, 694 (agency liability under section 1983 where misconduct of individual officers was undertaken pursuant to official policy).

connection with state law tort claims, which frequently accompany section 1983 claims, the scope of an officer's duty to the suspect or others[18] or the statutory defenses of justification or immunity[19] may also be at issue. Because the Fourth Amendment focuses more narrowly on the moment force is used than state tort law does (*Hayes v. County of San Diego, supra*, 57 Cal.4th at p. 638), placing less emphasis on matters preceding that instant than tort law does, officer training and tactics can potentially be relevant for purposes of tort liability, where it is not for Fourth Amendment purposes.

Here, the perceptions of Officers Moody and Ricchiuto as to the circumstances they faced on the evening of November 14, 2011 were certainly in issue—and of course they testified at length about what they were seeing and thinking—but those perceptions and the officers' responses to the situation were to be evaluated in objective terms. While RPD's programmatic approach to training might have been relevant had Brown attacked the credibility of these two officers with charges of rogue conduct in violation of RPD rules or policy, the prosecution never argued that expert testimony was needed because Brown opened the door to it. Nor was there any basis to do so. Brown's defense, which

---

[17] *Blankenhorn*, *supra*, 485 F.3d at page 485 ("Blankenhorn also seeks to hold Chief Romero liable for Nguyen's alleged use of excessive force in punching Blankenhorn during the arrest. Chief Romero can be held liable in his individual capacity ' "for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation[;] or for conduct that showed a reckless or callous indifference to the rights of others." ' "); see *Canton v. Harris* (1989) 489 U.S. 378 (respondeat superior liability under section 1983 where supervisor was deliberately indifferent to misconduct of individual officers under him).

[18] *Calatayud v. State of California* (1998) 18 Cal.4th 1057 (officers brandishing shotguns while making an arrest owed no duty of care to fellow officer who was shot when one of the shotguns accidentally discharged).

[19] *Martinez*, *supra*, 47 Cal.App.4th at page 349 & footnote 8 (defenses of official justification under Pen. Code, § 196 and official immunity under Gov. Code, § 820.2 apply to wrongful death claim in civil excessive force suit against officers for shooting knife-wielding man who was high on PCP).

focused on the "lawful performance" element of the section 69 charge, framed the excessive force issue in purely Fourth Amendment terms. According to him, the applicable rule of conduct was constitutional, not one found in a policy manual or in the teachings of Sergeant Walle. As the court observed in *Thompson*, "police rules, practices and regulations vary from place to place and from time to time," and as a result, "are an unreliable gauge by which to measure the objectivity and/or reasonableness of police conduct" under the Fourth Amendment. (*Thompson, supra*, 472 F.3d at p. 455.)

e. Prejudice

The erroneous admission of Sergeant Walle's testimony compounded the prejudicial effect of the court's failure to instruct on the lesser included offense of simple assault. The nub of the matter is that the jury could have found that this 67-year-old's behavior in struggling against arrest and swinging at these two officers, if that is what he did, was never a genuine threat to them. Had the jury undertaken a close examination of the facts, as the reasonableness standard under *Graham* required it to do—without the temptation to short-circuit its decisionmaking process by concluding that the officers simply did as they were trained to do—Brown had a materially stronger case for a more favorable outcome on the section 69 charge than he was able to muster with Sergeant Walle's testimony in the mix. Brown suggests that the distorting impact of Sergeant Walle's testimony so impaired the jury's independence as to violate his constitutional rights to a fair and impartial jury and to due process, justifying reversal under *Chapman v. California* (1967) 386 U.S. 18, but we see no need for such strong medicine. It suffices to say that, without the distraction of Sergeant Walle's testimony, there was a reasonable probability that he would have obtained a better result on the section 69 charge than he did. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

The law provides a generous mantle of protection to law enforcement officers accused of excessive force, but also contemplates that, where such questions are serious enough to be tried, juries will have a vital role in deciding what constitutes objectively reasonable force, bringing with them their independent sense of the values of the community in which they sit. Because Sergeant Walle's testimony failed to meet two

35

fundamental requisites for expert testimony—that the expert must add something to the common fund of knowledge the jury brings to its task, and that the expert must not usurp the court's role in giving the jury guidance on the law—the admission of his testimony not only undercut the jury's ability to perform this vital role, but prejudiced Brown's ability to mount a defense to the section 69 charge. [20]

## IV.

## CONCLUSION AND DISPOSITION

The judgment is affirmed with the exception of Brown's conviction for violating section 69, which is conditionally reversed pursuant to the procedure outlined in *People v. Hayes*, *supra*, 142 Cal.App.4th at page 184. If, after the filing of the remittitur in the trial court, the prosecutor does not retry Brown on the charged offense within the time limit of Penal Code section 1382, subdivision (a)(2), the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction of the lesser included offense of simple assault in violation of Penal Code section 240, and shall resentence Brown accordingly.

---

[20] Though the question is a close one, if the jury had been instructed on the lesser included offense of simple assault and had returned a guilty verdict on that count, we would not have reached the same conclusion as to the assault conviction. Because the section 69 element of lawful performance of duty is not an element of assault, the prejudice analysis would have been quite different. The issue of excessive force was potentially relevant to assault, but in a different way than it was to the section 69 charge. There is no evidence in the record to support a defense to assault that, in response to unreasonable or excessive force by the officers, Brown used a "degree of force" that he "actually believe[d]" was reasonably necessary to protect himself. (CALCRIM No. 2670.) Brown may have flailed reflexively at the officers, but he did not testify that he was trying to defend himself. Thus, we conclude there is no reasonable likelihood of outright acquittal for his conduct in the fracas leading to his arrest. As Brown's counsel argued in his opening brief, the scenario in which the jury found that Brown swung at the officers would support a conviction for "simple assault rather than forcible resistance to lawful police conduct under section 69. That view of the facts—i.e., that there was improper or excessive use of force on both sides—was frankly the most plausible interpretation of the evidence."

_____
Streeter, J.

I concur:


_____
Rivera, J.


A141172/*People v. Brown*

37

Concurring opinion of Ruvolo, P. J.

I concur with the majority that the conviction for resisting an officer in the performance of lawful duties (Pen. Code, § 69) must be reversed because the trial court failed to instruct the jury on the lesser included offense of simple assault (Pen. Code, § 240), and there exists a reasonable probability that a different result would have occurred had the jury been given the omitted instruction.

Because this conviction must be reversed on this principal ground, there is no need to discuss the issue of the alleged erroneous admission of expert testimony posited as an alternative ground for reversal, let alone publish a discursive opinion on this legally and factually complex subject.  Indeed, Brown's appellate counsel agreed at oral argument that if the Penal Code section 69 conviction were to be reversed based on the failure to instruct on the lesser offense of simple assault, there was no need to decide the alternative evidentiary ground for reversal.

_____
RUVOLO, P. J.

A141172, *People v. Brown*

1

*People v. Brown* (A141172)


Trial Court:                               Contra Costa County Superior Court


Trial Judge:                               Hon. Mary Ann O'Malley


Counsel for Defendant and Appellant:     Jonathan Soglin, Executive Director
J. Bradley O'Connell, Assistant Director
First District Appellate Project


Counsel for Plaintiff and Respondent:     Kamala D. Harris
Attorney General of California

Jeffrey M. Laurence
Acting Senior Assistant Attorney General

Gregg E. Zywicke
Deputy Attorney General

Bruce M. Slavin
Deputy Attorney General