Filed 9/11/20  P. v. Mendez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G057224 |
| v. | (Super. Ct. No. 17CF0961) |
| BONIFACIO ANTUNEZ MENDEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Conditionally reversed with directions.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

Bonifacio Antunez Mendez appeals from a judgment after a jury convicted him of aggravated assault on a peace officer, resisting and deterring an executive officer, harassing and hindering a police animal, and carrying a dirk or dagger, and found true he personally used a deadly weapon. Mendez argues the following: (1) we should remand the matter for the trial court to determine whether he is eligible for pretrial mental health diversion; (2) the trial court erred in instructing the jury; and (3) we should remand the matter to determine whether he has the ability to pay court imposed fines and fees.

As we explain below, we conditionally reverse the judgment and remand the matter to the trial court with directions to conduct a mental health diversion eligibility hearing and consider any claim that Mendez does not have the ability to pay fines and fees. Mendez's instructional claims are meritless.

FACTS

I. *Substantive Facts*

Loren Lau owned a food market in Santa Ana where homeless individuals frequently loitered. One afternoon, Mendez began banging on the market window. Lau and an employee went outside and asked Mendez, in English and Spanish, to leave the premises. Mendez began yelling "'this is my nation.'" Mendez pulled out a knife and moved towards them. Lau pulled out a Taser and warned Mendez. Lau and the employee went back into the market. Another market employee called 911.

Officers Chris Donahue and John Pace arrived at the market. The officers saw Mendez with a four-foot wood[1] pole in one hand and a 40-ounce beer bottle about three quarters full in the other hand. Mendez was waving the objects at the officers and making inaudible noises. Donahue drew his gun, and Pace drew his Taser.

---

[1] The item is variously described as a metal or wood pole or stick. When the item was introduced at trial, Donahue said it was wood.

2

Donahue and Pace approached Mendez and repeatedly asked him to drop the pole and bottle and get on the ground. Donahue saw a knife blade protruding from Mendez's back pocket. Mendez slowly moved towards the officers and continued waving the objects and yelling incoherently. The officers continued to repeat instructions to drop the objects and get on the ground. Corporal Joshua Gripentrog arrived at the market.

When Mendez refused to comply with the officers orders, Pace fired the Taser at him, and it hit his jacket. Mendez paused momentarily, but he continued to disobey the officers orders to drop the objects and get on the ground.

Meanwhile, Gripentrog told Mendez to drop the objects and get on the ground or he would release his canine, Marko. Mendez defied the orders, and Gripentrog released Marko. As Marko approached him, Mendez swung the bottle at Marko but missed. Marko bit Mendez's leg. Mendez first swung and then threw the bottle at Marko but both missed. Mendez used the pole as a crutch to maintain his stance while Marko tried to pull him down. Donahue kicked out the pole, brought Mendez to the ground, and handcuffed him. Officers found a knife and scissors in Mendez's pockets.

## II. Procedural History

An amended information charged Mendez with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1), all further statutory references are to the Penal Code, unless otherwise indicated) (counts 1 and 2—Lau and employee), aggravated assault on a peace officer (§ 245, subd. (c)) (counts 3 and 4), resisting and deterring an executive officer (§ 69) (counts 5 and 6), harassing and hindering a police animal (§ 600, subd. (b)) (count 7), and carrying a dirk or dagger (§ 21310) (counts 8 and 9). As to counts 5 and 6, the information alleged Mendez personally used a deadly weapon (§ 12022, subd. (b)(1)).

Before trial, Mendez's counsel declared doubt as to his competence. Two mental health professionals evaluated him. A psychiatrist opined Mendez possibly suffered from paranoid schizophrenia or substance induced psychotic disorder but he was competent to stand trial. A psychologist opined he probably suffered from a psychotic disorder but he was competent to stand trial. The trial court read and considered the reports, and found Mendez competent to stand trial.

At trial in November 2018, Donahue testified Mendez could have used the wood pole and beer bottle as deadly weapons. During closing argument, as relevant here, the prosecutor addressed the deadly weapon requirement. The trial court instructed the jury inter alia on the offenses with CALCRIM Nos. 860, 875, and 2651. The court instructed the jury on lesser included offenses as follows: counts 1, 2, 3, and 4—simple assault (CALCRIM No. 915); and counts 5 and 6—resisting a peace officer (CALCRIM No. 2656). Finally, the court instructed the jury on the deadly weapon enhancement with CALCRIM No. 3145.

The jury deadlocked on counts 1 and 2 and the trial court declared a mistrial and dismissed them. The jury convicted Mendez of all remaining counts and found true the deadly weapon allegations.

The trial court sentenced Mendez to prison for six years and four months as follows: count 3-four years; count 4-16 months; and count 7-one year. The court imposed and stayed the sentences on counts 5 and 6 and the enhancements (§ 654), and imposed concurrent sentences on counts 8 and 9. The court ordered him to pay a $300 restitution fine (§ 1202.4), a $300 parole revocation fine (stayed) (§ 1202.45), a $40 court operation assessment fee (§ 1465.8), and a $30 conviction assessment fee (Gov. Code, § 70373).

4

DISCUSSION

## I.  Pretrial Mental Health Diversion

Mendez asserts we should conditionally reverse the judgment and remand the matter for the trial court to conduct a pretrial mental health diversion eligibility hearing.  Based on the California Supreme Court's recent decision in *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*), we agree.

Effective June 27, 2018, the Legislature added section 1001.36.  (Stats. 2018, ch. 34, § 24, pp. 34-37.)  Pursuant to section 1001.36, defendants suffering from mental disorders may be eligible for pretrial diversion (§ 1001.36, subd. (a)), which is defined as "postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment[]" (§ 1001.36, subd. (c)).  "If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion."  (§ 1001.36, subd. (e).)

In his opening brief, Mendez argued section 1001.36 applied retroactively and we must remand the matter for an eligibility hearing (§ 1001.36, subd. (b)(3)).  Anticipating the Attorney General (AG) may raise forfeiture, Mendez claimed he received ineffective assistance of counsel.  But in his respondent's brief the AG did not argue forfeiture.  Instead, he replied section 1001.36 applies only prospectively.

After briefing was complete, the *Frahs* court held that under the rule of *In re Estrada* (1965) 63 Cal.2d 740, section 1001.36 applies retroactively to all judgments not yet final on appeal.  (*Frahs, supra,* 9 Cal.5th at pp. 624-625.)  We invited the parties to submit supplemental briefs on the effect of *Frahs* on this appeal.

5

In his supplemental brief, the Attorney General switches gears and now claims Mendez forfeited relief because section 1001.36 became effective before trial commenced and he did not request an eligibility hearing. Section 1001.36 became effective in June 2018. Trial commenced five months later in November 2018.

A criminal defendant is entitled to the benefit of a statute if it applies retroactively to his case. (See *People v. Buycks* (2018) 5 Cal.5th 857, 881-882 [beneficial changes to criminal law applied broadly].) Because of the preference for applying the ameliorative changes to criminal law as broadly as possible, we decline the AG's request to find forfeiture. We note that in his opening brief, Mendez raised the forfeiture issue, but in his respondent's brief, the AG limited his argument to retroactivity. It was not until the AG lost the retroactivity issue that he raised the forfeiture contention for the first time in his supplemental brief, which is untimely. (*Randall v. Mousseau* (2016) 2 Cal.App.5th 929, 936 [new substantive arguments raised for first time in supplemental brief deemed forfeited].)

We have reviewed the psychiatrist's and psychologist's confidential reports. Their reports provide evidence Mendez may suffer from a qualifying mental disorder. Based on *Frahs*, Mendez is entitled to a conditional limited remand for an eligibility determination under section 1001.36. (*Frahs, supra,* 9 Cal.5th at pp. 624-625.)

Pursuant to the procedure adopted in *Frahs*, "'[i]f the trial court finds that [the defendant] suffers from a mental disorder, does not pose an unreasonable risk of danger to public safety, and otherwise meets the six statutory criteria (as nearly as possible given the postconviction procedural posture of this case), then the court may grant diversion. If [Mendez] successfully completes diversion, then the court shall dismiss the charges. However, if the court determines that [Mendez] does not meet the criteria under section 1001.36, or if [he] does not successfully complete diversion, then his convictions and sentence shall be reinstated.' [Citation.]" (*Frahs, supra,* 9 Cal.5th at p. 637.) As remand is conditional, we must address Mendez's remaining claims.

6

*II.  Jury Instructions*

*A.  Deadly Weapon*

Mendez argues the trial court erred by presenting the jury with a legally invalid theory concerning a deadly weapon as to counts 3 and 4 and the weapon enhancements as to counts 5 and 6.  We agree but conclude he was not prejudiced.

An object can be a deadly weapon either (1) if it is inherently deadly in the ordinary use for which it was designed or (2) the object is used in a manner likely to produce great bodily injury.  (*People v. Aledamat* (2019) 8 Cal.5th 1, 6 (*Aledamat*); § 245, subd. (a)(1).)  "'In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.' [Citations.]" (*Aledamat, supra,* 8 Cal.5th at p. 6.)  Neither a wood pole nor a beer bottle are inherently deadly weapons because they were not designed for that use.  (See *ibid.* [deadly weapon ordinary use for which it is designed].)

Here, as to counts 3 and 4, the trial court instructed the jury with CALCRIM No. 860, which stated "deadly weapon" was defined in another instruction. The relevant portion of CALCRIM No. 875 provided, "The term *deadly weapon other than a firearm* is any object, instrument, or weapon *that is inherently deadly* or one that is used in such a way that is capable of causing and likely to cause death or great bodily injury."  (Second italics added.)  Finally, as to the firearm enhancement, the court instructed the jury with CALCRIM No. 3145, which stated, "A *deadly weapon* is any object, instrument, or weapon *that is inherently deadly* or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."  (Second italics added.)

As the *Aledamat* court concluded, the italicized portion of the instruction while correct in the abstract was inapplicable here because the weapons, a wood pole and beer bottle, were not inherently deadly weapons as a matter of law.  (*Aledamat, supra,*

7

8 Cal.5th at p. 7.)  The Attorney General agrees this portion of the instructions was inapplicable.  Thus, the trial court presented the jury with a legally invalid theory.  Pursuant to *Aledamat, supra,* 8 Cal.5th at page 13, we must determine whether this legal error was harmless beyond a reasonable doubt pursuant to *Chapman v. California* (1967) 386 U.S. 18.

Applying this standard, the *Aledamat* court determined beyond a reasonable doubt any error was harmless for the following reasons.  First, CALCRIM No. 3145 required the jury to "'consider all of the surrounding circumstances including when and where the object was possessed and . . . whether the object would be used for a dangerous rather than harmless purpose.'" (*Aledamat, supra,* 8 Cal.5th at p. 14.)  The court reasoned it was unlikely the jury would conclude the box cutter was inherently deadly without considering the surrounding circumstances, including how defendant used it.  (*Ibid.*)  Second, the court focused on counsels' arguments, noting that although the prosecutor mentioned an inherently deadly weapon, "no one ever suggested to the jury that there were two separate ways it could decide whether the box cutter was a deadly weapon," and "counsel never argued that, if he did assault the victim with the box cutter, the box cutter was not a deadly weapon." (*Ibid.*)  Instead, defense counsel argued defendant did not assault the victim at all.  (*Ibid.*)  Finally, the jury necessarily found the following:  "(1) defendant did an act with a deadly weapon (either inherently or as used) that by its nature would directly and probably result in the application of force; (2) defendant was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and (3) defendant had the present ability to apply force with a deadly weapon to a person." (*Id*. at p. 15.)  The court concluded, "'No reasonable jury that made all of these findings could have failed to find' that defendant used the box cutter in a way that is capable of causing or likely to cause death or great bodily injury.  [Citation.]" (*Ibid.*)

Contrary to Mendez's claim, this case is similar to *Aledamat*. First, the trial court instructed the jury with CALCRIM No. 3145 that, "In deciding whether an object is a deadly weapon, consider all the surrounding circumstances, including when and where the object was possessed, where the person who possessed the object was going[,] and any other evidence that indicates whether the object would be used for a dangerous, rather than a harmless, purpose." Here, too, it was unlikely the jury would conclude the wood pole and beer bottle were inherently deadly without considering the surrounding circumstances, including how Mendez used them. Mendez waived the wood pole and beer bottle in a threatening manner at the officers. Ignoring the officers' commands to drop the objects, Mendez moved towards the officers yelling incoherently and waving the objects. Mendez was not using the wood pole and beer bottle for a harmless purpose. No, from this evidence the jury could certainly conclude he was using them in a dangerous and forceful manner.

Additionally, during closing argument, the prosecutor referred to the wood pole and beer bottle when discussing the relevant facts. When discussing the elements of aggravated assault on a peace officer, he repeatedly referred to Mendez's actions with the wood pole and beer bottle and incoherent vocalizations. On five occasions the prosecutor referred to how Mendez "used" the objects.

Mendez complains the prosecutor when discussing counts 1 and 2, referred to the knife as a deadly weapon, and a little later, when discussing counts 3 and 4, said, "It's essentially the same thing[.]" He relies on this comment to claim the jury would conclude a wood pole and beer bottle were a deadly weapon like a knife. We disagree, as the prosecutor's comment was in the context of discussing the elements of the crimes. Additionally, Mendez does not cite to any place in the record, and we found none, where the prosecutor stated "inherently deadly" when he referred to the wood pole and beer bottle. The prosecutor's arguments concerning the wood pole and beer bottle were limited to the manner in which Mendez used those objects. This was proper. (*Aledamat,*

9

*supra,* 8 Cal.5th at p. 6.)  Thus, like in *Aledamat*, we conclude beyond a reasonable doubt the instructional errors were harmless.

## B.  *Lesser Included Offense*

Relying on *People v. Brown* (2016) 245 Cal.App.4th 140 (*Brown*), Mendez contends the trial court erred by failing to instruct the jury sua sponte on the lesser included offense of simple assault as to counts 5 and 6 because the officers used excessive force.  We disagree.

In criminal cases, the trial court must instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present but not when there is no evidentiary support for the theory.  (*People v. Smith* (2013) 57 Cal.4th 232, 239 (*Smith*).)  To determine whether a lesser offense is necessarily included in the charged offense, either the elements test or the accusatory pleading test must be met.  (*Id*. at p. 240.)  We review the trial court's failure to instruct de novo.  (*Brown, supra,* 245 Cal.App.4th at p. 152.)

Violation of section 69 can be committed two different ways:  attempting to deter a peace officer or resisting an officer by the use of force or violence.  (*Smith, supra,* 57 Cal.4th 232, 240-241.)  The first way of violating section 69 requires neither the actual use of force or violence nor that the officer be in the performance of his or her duty at the time the threat is made.  (*Ibid*.)  The second way requires both.  (*Id*. at p. 241.)

In *Brown, supra,* 245 Cal.App.4th at page 146, a 67-year-old defendant was riding his bicycle on the sidewalk while wearing headphones and without a headlight near dusk.  When an officer yelled at defendant to stop, he sped up and tried to flee. (*Ibid*.)  Officers pursued him, cornered him, and, after a brief altercation, arrested him. (*Ibid*.)  The parties' descriptions of the altercation were very different.  (*Ibid*.)  According to the officers' testimony, defendant was aggressive, noncompliant, and combative, repeatedly swinging his fists even after being struck.  (*Id*. at pp. 146-147.)  Defendant, however, testified that after he fell off his bicycle, an officer dove on him and hit him in

10

the head three times, and he did not swing at the officers or otherwise resist after he fell. (*Id*. at p. 147.)  Defendant was charged with violating section 69.  (*Id*. at pp. 149-150.) Defendant argued the officers did not act lawfully because they used unreasonable and excessive force.  (*Id*. at p. 150.)  The court instructed on the lesser include offense of resisting (§ 148, subd. (a)), and whether the officers lawfully performed their duties (CALCRIM No. 2670), but not on misdemeanor assault.  (*Brown, supra,* 245 Cal.App.4th at p. 150.)  The jury convicted defendant of violating section 69. (*Brown, supra,* 245 Cal.App.4th at p. 150.)

The *Brown* court held the trial court had a sua sponte duty to instruct on misdemeanor assault as a lesser included offense of felony trying to prevent an executive officer from performing a duty.  (*Brown, supra,* 245 Cal.App.4th at p. 153.)  The court reasoned that although assault was not a lesser included offense under the statutory elements test, it was a lesser included offense under the accusatory pleading test because the amended information charged defendant with both ways of violating section 69. (*Brown, supra,* 245 Cal.App.4th at p. 153.)  Additionally, the court opined there was substantial evidence to support the instruction.  (*Id*. at pp. 154-155.)  The court reasoned as follows:  "[T]he jury could have, on the one hand, believed [defendant's] testimony that he did not resist the officers before he fell or was pushed off his bike and was then tackled and slugged by [the officer] while face down on the ground, unresisting and ready to surrender—a scenario that would have made the arrest unlawful due to excessive force. The jury could still, on the other hand, have accepted the officers' testimony that [defendant] wheeled and repeatedly swung at them, striking both officers." (*Ibid*.)  The court added that if the jury concluded defendant used reasonable force when he swung at the officers, that would have supported a conviction for simple assault instead of forcible resisting to lawful police conduct and it was error not to instruct on misdemeanor assault. (*Id*. at pp. 154-155.)  The court concluded the error was prejudicial because the defense's

11

primary theory was excessive force but the instructional error precluded the jury from considering that theory.  (*Id*. at p. 155.)

Here, like in *Brown*, the amended information charged Mendez with both ways of violating section 69, and thus misdemeanor assault was a lesser included offense of felony trying to prevent an executive officer from performing a duty under the accusatory pleading test.  However, unlike *Brown*, there was insufficient evidence to support that theory.  Mendez did not testify the officers attacked him without provocation.  There is no evidence in the record the officers used any force against him until Pace fired the Taser at him.  The record demonstrates that to this point, the officers were lawfully performing their duties by trying to convince a man who was armed with three weapons to drop them and get on the ground.  About 30 seconds after Pace fired the ineffective Taser at Mendez, who was still disobeying the officers' orders, Gripentrog released Marko.  When Marko bit Mendez, he was still not following the officers' commands.  By the time the officers exhibited any force, which contrary to Mendez's claim was justified because of his behavior, Mendez had already committed all the acts necessary for the greater offense of resisting an executive officer with violence.  In other words, Mendez's actions were not in response to the officers' unlawful use of force.  Finally, the one wound Marko inflicted to Mendez's leg does not alter our conclusion where, again, there was no evidence Mendez's force or violence was in response to unreasonable or excessive force by Donahue and Pace.  The trial court did not have a sua sponte duty to instruct on misdemeanor assault as a lesser included offense to counts 5 and 6 because there was no evidence that the offense was less than those charged.

III.  *Fines & Fees*

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, Mendez argues the trial court violated his right to due process by ordering him to pay fines and fees without an ability to pay hearing.  We do not need to decide this issue because Mendez

will have the opportunity at the mental health diversion eligibility hearing to request a hearing on his ability to pay if he chooses to do so.

## DISPOSITION

The judgment is conditionally reversed. The matter is remanded to the trial court with directions to conduct a mental health diversion eligibility hearing pursuant to section 1001.36. If the court finds the statutory criteria are met, it may grant diversion, and if defendant successfully completes diversion, the court shall dismiss the charges.

If, however, the court determines that defendant is not eligible for mental health diversion pursuant to section 1001.36, or if defendant commits a new crime or does not successfully complete the diversion program, the judgment of conviction shall be reinstated, and defendant must be resentenced. The court may also consider any request Mendez does not have the ability to pay fines and fees.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.


13