Filed 8/22/25  P. v. Brown CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,  Plaintiff and Respondent,  v.  THORNELL BROWN,  Defendant and Appellant. | D083030  (Super. Ct. No. SCS322710) |

APPEAL from a judgment of the Superior Court of San Diego County, Maryann D'Addezio, Judge.  Affirmed.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

Thornell Brown appeals from his second degree murder conviction on eight grounds.  Brown contends the trial court:  (1) erred in refusing to instruct the jury on sudden quarrel or heat of passion voluntary

manslaughter (heat of passion); (2) improperly instructed the jury on malice; (3) erred in responding to a question from the jury regarding the different forms of homicide; (4) incorrectly instructed the jury on imperfect self-defense; and (5) improperly excluded testimony from Brown's prison expert. Brown also argues (6) the prosecutors erred and violated the Racial Justice Act (RJA) by using the word "hunt" to describe Brown's actions; (7) his trial counsel was ineffective for failing to raise some of the issues Brown now raises on appeal; and (8) the cumulative effect of the claimed errors prejudiced Brown. Finding no merit to these claims, we affirm the conviction.

## II. BACKGROUND

During the middle of the day on June 4, 2022, Frank Gallegos was walking across the street in National City. Brown parked his vehicle next to Gallegos as Gallegos was approaching the curb. Brown exited his vehicle and ran at Gallegos, causing Gallegos to retreat into the street. Brown pushed Gallegos further into the street, where the two men ended up fighting underneath the trailer of a semitruck. Brown came out from under the trailer first, pushing a stumbling Gallegos to the ground near the curb. As Gallegos lay on his side, Brown punched him numerous times.

Gallegos got on his hands and knees as Brown maneuvered behind him and straddled the lower half of Gallegos's body. Gallegos grabbed a small black object from the ground. Meanwhile, Brown removed a knife from his waistband, and after unsnagging it from his shirt and removing its sheath, Brown plunged the knife into Gallegos's back two times. Gallegos was pushing himself to his feet and constrained by Brown's legs while getting stabbed. Brown walked back to his car and drove off, while Gallegos staggered away.

Brown circled the block, while Gallegos walked to a nearby parking lot. Brown drove into that parking lot, slowed to a stop, and then accelerated, hitting Gallegos with the front of his car and driving over him with the front right wheel. Brown reversed, again running over Gallegos with the car's front right wheel, and exited the parking lot.

Gallegos died at a hospital several hours later. An autopsy revealed numerous injuries to Gallego's head, arms, and legs, as well as two stab wounds in his back. One of the stab wounds was three to four inches deep, fatally penetrating Gallegos's lung. An officer searched Gallegos, finding a black and silver box cutter in his pants that had blood on its blade and handle. Gallegos's and Brown's DNA were found on the handle of the box cutter, but only Gallegos's DNA was found on the blade.

Civilians at a nearby market and a local bank reported to the National City Police Department Brown's license plate number. They also provided to responding officers cell phone video of the stabbing. Using this information a police officer arrested Brown later that evening. Brown had with him in his car the knife used in the killing, as well as a gun. Brown had two fresh cuts on his head that were approximately 2 centimeters long and fresh scrapes on his knees. Brown also had a healed wound on his neck and a scratch on his chest.

On June 8, 2022, the San Diego District Attorney's Office charged Brown with murder (§ 187, subd. (a); count 1), alleging that he personally used a knife and vehicle as deadly weapons in the commission of the offense (§ 12022, subd. (b)(1)). Prosecutors also charged Brown with possession of a firearm by a felon for the gun that was found in his vehicle when he was arrested (§ 29800, subd. (a)(1); count 2).

At Brown's 2023 trial, the jury saw footage of the killing. Surveillance cameras and a witness's cell phone captured the entire incident. The footage shows the two men wrestling and punching under the semitruck, but it is unclear if any weapons were used at that point. However, after emerging from under the semitruck, the footage clearly depicts Brown stabbing Gallegos in the back twice. Four witnesses also described their observations of the incident, testifying that they did not observe any weapons until Brown used his knife after the two men came out from under the semitruck.

Brown testified in his own defense, explaining his relationship with Gallegos. The two men knew each other because Gallegos lived in the same building as Brown's sister. Brown stated he lent Gallegos $20 on two separate occasions, which Gallegos refused to repay. On two other occasions, Gallegos called Brown a "mayate," which Brown, who is African-American, understood to be the Spanish equivalent of the N-word. Brown had also heard that Gallegos swindled Brown's sister, but Brown was not sure if that was true.

Brown also described his experience in prison for the jury, explaining the importance of respect in that racially segregated environment. Brown asserted that prisoners commonly resort to violence if a member of one race says something derogatory to a member of another race, and theft between the races could result in beatings or stabbings. According to Brown, an inmate cannot show weakness, and failing to respond to disrespect shows weakness. Brown testified that this prison mentality comprises part of his moral code, but he has been trying to shed it since being released. Brown knew Gallegos had been to prison, so it made Brown furious when Gallegos called him a racial slur. Brown would have immediately assaulted Gallegos if that happened in prison.

Regarding the murder, Brown testified that he was unloading his belongings to bring to his sister's residence when Gallegos intentionally bumped into him and stole something. Brown told the jury, "it took me a couple of minutes, and I was contemplating on am I gonna do something to this dude?" After "digesting" the situation, Brown "came to the conclusion" that he was going to "whoop [Gallegos's] ass." Even though he could have immediately pursued Gallegos, Brown's belongings were vulnerable, so Brown decided to repack his car. This took about five minutes because Brown had to pack his items in a manner that did not obstruct his view while driving. Brown then drove off looking for Gallegos.

Brown admitted being the initial aggressor but claimed that Gallegos sliced him with a blade when the two were under the semitruck. In response, Brown testified, "I had fear for my life. . . . So I went into whatever you want to call it to survive a situation. I don't know how I got there, but I knew what I had to do. And I knew how I feel. I felt I was gonna lose my life at that moment. So I responded to the situation." Brown testified that Gallegos dropped his knife, but he was reaching for it and ultimately picked it up, so Brown considered Gallegos a threat when Brown stabbed Gallegos. Nonetheless, Brown acknowledged that he could have left prior to drawing his knife, and when the knife got caught in his shirt, Brown had already decided that he was going to stab Gallegos.

After he stabbed Gallegos twice, Brown "considered the threat somewhat neutralized." But after driving around the block and seeing Gallegos "still walking strong," Brown feared for his sister's life because he thought Gallegos would retaliate against her. So, believing his actions were justified, Brown "ran [Gallegos] over to terminate him. To terminate his threat."

Brown characterized his actions as "self-defense" several times. Brown also described himself as being in that "zone" or "place" while stabbing Gallegos and running him over with his car. When asked to clarify, Brown said "my life was threatened. . . . All I know I need to stop him and that's what I did. . . . I wanted to stop him."

The trial court instructed the jury on first and second degree murder, self-defense, and voluntary manslaughter based on imperfect self-defense or defense of another. The trial court denied Brown's request to instruct the jury on manslaughter resulting from heat of passion.

The jury found Brown guilty of second degree murder, determining that the personal deadly weapon allegations were true. The jury also found Brown guilty of count 2. The trial court sentenced Brown to 42 years to life in prison.[1] Brown's timely appeal followed.

## III. DISCUSSION

A. *The Trial Court Did Not Err in Refusing to Give the Heat of Passion Instruction*

Brown argues the trial court erred in refusing his request to instruct the jury on heat of passion. Brown claims that based on his testimony, the jury could have concluded that Gallegos's long-term disrespectful conduct provoked Brown to act in a heat of passion when he engaged in the fistfight with Gallegos, and Brown became further enraged when Gallegos sliced Brown with a weapon. We disagree.

---

[1] Brown's prison term consisted of 15 years to life for the murder, doubled to 30 due to a prior strike conviction; one year for the personal use of a knife; three years for the firearm possession, doubled to six due to a prior strike conviction; and five years for a prior serious felony. The trial court stayed Brown's sentence for personal use of a vehicle as a deadly weapon.

6

"Murder is the unlawful killing of a human being with malice aforethought." (§ 187, subd. (a).) However, murder may be reduced to voluntary manslaughter if the defendant acts "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) "Heat of passion has both objective and subjective components. Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. . . . [¶] Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion' induced by such provocation." (*People v. Enraca* (2012) 53 Cal.4th 735, 759, citation omitted.)

Heat of passion voluntary manslaughter is a lesser included offense of murder. (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).) A trial court must instruct on lesser included offenses " 'only where there is "substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense.' [Citation.] 'Substantial evidence,' in this context, 'is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " (*People v. Williams* (2015) 61 Cal.4th 1244, 1263.)

" 'We review de novo a trial court's failure to instruct on a lesser included offense [citation], and in doing so we view the evidence in the light most favorable to the defendant[s].' " (*People v. Dominguez* (2021) 66 Cal.App.5th 163, 175.)

To support the heat of passion instruction, Brown relies on his own testimony describing the circumstances that preceded his fatal encounter with Gallegos. Brown cites Gallegos's prior use of a racial slur on two occasions, Gallegos's refusal to repay Brown's $40 loan, Gallegos's alleged swindling of Brown's sister, and Gallegos's theft from Brown shortly before

7

the fight. Brown also relies on his prison experiences as a factor relevant to provocation.

However, Brown's testimony negates the subjective component of heat of passion. Brown explained that after Gallegos bumped into him and stole something, "it took [him] a couple of minutes, and [he] was contemplating" whether he was going to do something to Gallegos and "digesting" the situation. Brown stated he "contemplated it for a minute and came to the conclusion" that he was going to "whoop [Gallegos's] ass." Brown also acknowledged that he could have immediately pursued Gallegos, but his belongings were vulnerable. Brown therefore decided to repack his car, which took about five minutes because he had to ensure he had a clear view while driving. Based on this testimony, Brown contemplated the situation before deciding to fight, and he had the wherewithal to protect his property and pack it safely in his car. Accordingly, by his own description, Brown did not act rashly or without deliberation when he decided to pursue Gallegos and attack him.

Brown also points to his testimony that he was in that "zone" or "place" during the attack, arguing this evidence shows that he acted in the heat of passion. But when asked what he meant by that "zone" or "place," Brown testified, "my life was threatened. . . . All I know I need to stop him and that's what I did. . . . I wanted to stop him." Brown told the jury, "I knew what I had to do. And I knew how I feel. I felt I was gonna lose my life at that moment. So I responded to the situation." Brown also acknowledged deciding to stab Gallegos before taking that action, which he described as "self-defense" several times. At that point Brown "considered the threat somewhat neutralized," but then he reevaluated when he saw Gallegos still

8

walking. Fearing for his sister's life, Brown believed he was "in the right" to "r[u]n [Gallegos] over to terminate him. To terminate his threat."

These circumstances are like those in the California Supreme Court's decision in *Moye*. In that case, the defendant testified that the victim attacked him with a bat, the defendant was able to wrest the bat from the victim, the victim continued attacking the defendant, and each time, the defendant hit the victim defensively with the bat. (*Moye, supra*, 47 Cal.4th at p. 552.) The defendant testified " 'I was defending my life. That's what I was doing. I thought he was going to kill me so I hit him until he stopped moving.' " (*Id*. at p. 553.) Our Supreme Court determined that "[i]n the face of defendant's own testimony, no reasonable juror could conclude defendant acted ' " 'rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " ' " (*Id*. at p. 553.) The high court reached this conclusion despite the defendant's testimony that he was "not 'in the right state of mind' " because the defendant "immediately explained what he meant by that statement—he was worried about getting hit by [the victim] because he did not want to 'get beat down and possibly be killed.' " (*Id*. at p. 552.) The California Supreme Court also found no evidence that the defendant panicked in the face of the attack; "in contrast, defendant testified he acted deliberately in seeking to defend himself." (*Id*. at p. 555.)

Like the defendant in *Moye*, Brown's "only claim was that he acted out of self-defense" (*Moye, supra*, 47 Cal.4th at p. 554) or defense of another in killing Gallegos. Although Brown claimed to be in a "zone" or "place," he clarified that he was referring to his belief that his life was threatened and his decision to stop that threat. Because Brown's own testimony indicates he acted deliberately in seeking to protect himself and his sister, no reasonable

9

juror would conclude that Brown acted from passion rather than judgment when he killed Gallegos.

Based on the foregoing, there was not substantial evidence showing that Brown killed Gallegos in a heat of passion. The trial court therefore did not err in refusing to instruct the jury on that issue.

B.    *Trial Court Properly Instructed the Jury on Malice*

Brown argues that the trial court failed to instruct the jury that the People must prove the absence of imperfect self-defense or heat of passion to establish the malice element of murder.[2] Each of Brown's contentions on this issue, which we address below, lack merit.

We independently review a claim of instructional error. (*People v. Barber* (2020) 55 Cal.App.5th 787, 798.) "[W]e consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. [Citation.] ' "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." ' " (*Id.* at pp. 798–799.)

First, Brown is incorrect that the absence of imperfect self-defense or heat of passion is an element of murder that the trial court must instruct on in every case when murder is charged. "[A] murder defendant is not *entitled*

---

[2]    The People contend this claimed error, as well as those discussed in sections III(C), (D), and (F) are forfeited because Brown did not raise them in the trial court. However, Brown argues his trial counsel's failure to raise these issues amounts to ineffective assistance of counsel. We therefore address the merits of these claims. Because we find no error, Brown is unable to establish either prong required to prove ineffective assistance of counsel. (*In re Gay* (2020) 8 Cal.5th 1059, 1073 [" 'An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.' "].)

to instructions on the lesser included offense of voluntary manslaughter if evidence of provocation or imperfect self-defense, which would support a finding 'that the offense was less than that charged,' is lacking." (*People v. Rios* (2000) 23 Cal.4th 450, 463, fn. 10.)

Second, as explained above, there was insubstantial evidence of heat of passion; therefore, the trial court did not need to instruct the jury on that issue.

Finally, the trial court properly instructed the jury that the People had the burden of disproving imperfect self-defense. Pursuant to CALCRIM No. 571, the trial court explained that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense," and "[t]he People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder."

Brown claims the instruction in CALCRIM No. 571 was insufficient because CALCRIM No. 520, the instruction setting forth the elements of murder, did not address imperfect self-defense. He further contends the trial court and prosecutor directed the jury to decide the murder charge first, and the paragraph stating the People's burden of disproving imperfect self-defense was buried at the end of CALCRIM No. 571.

Contrary to Brown's claims, the trial court instructed the jury that it "may consider the[ ] different kinds of homicide in whatever order you wish." The trial court and the prosecutor merely informed the jury that in order to reach a verdict on a lesser included offense, the jury must find Brown not guilty of the greater offense or offenses. The trial court also told the jury to "[p]ay careful attention to all of these instructions and consider them

11

together." " 'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' " (*People v. Thomas* (2023) 14 Cal.5th 327, 382.) Finally, CALCRIM No. 520 "is a correct statement of the law" and CALCRIM No. 571 "properly include[s] the requirement that the prosecution disprove . . . imperfect self-defense beyond a reasonable doubt." (*People v. Howard* (2024) 104 Cal.App.5th 625, 661.)

With these principles in mind and based on the circumstances of this case, the trial court properly instructed the jury on malice.

C.    *The Trial Court Properly Responded to the Jury's Question Regarding Second Degree Murder and Voluntary Manslaughter*

During deliberations, the jury submitted a note asking for "the definition of 'second degree' " and "the difference between 'second degree' and 'voluntary manslaughter.' " The prosecutor and defense counsel agreed the jury should be directed to the previously given instructions. The trial court then responded to the note by stating, "[t]he definitions of second degree murder and voluntary manslaughter are included in the packet of jury instructions you have already received."

Brown contends the trial court erred in answering the jury's questions. He argues the note shows the jury was confused by the instructions on second degree murder and voluntary manslaughter and the trial court was required to respond by instructing that malice required the absence of heat of passion and imperfect self-defense. We disagree.

Pursuant to section 1138, if jurors " 'desire to be informed on any point of law arising in the case, . . . the information required must be given." However, " '[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full

and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky.' " (*People v. Kopp* (2019) 38 Cal.App.5th 47, 65.) "We review for an abuse of discretion any error under section 1138." (*Ibid*.)

As discussed above, the trial court correctly instructed the jury that the People had the burden of disproving imperfect self-defense, and the evidence did not warrant a heat of passion instruction. Further, the instructions describing murder and manslaughter were " 'full and complete,' " requiring no additional explanation. (*People v. Kopp, supra*, 38 Cal.App.5th at p. 65.) Finally, both parties agreed that referring the jury to the previously given instructions was the appropriate response to the note. The trial court therefore did not abuse its discretion when it decided no additional explanation was necessary.

D.    *The Trial Court Properly Instructed on Imperfect Self-defense*

Pursuant to CACLCRIM No. 571, the trial court instructed the jury that "[i]mperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force." Brown claims this instruction was overbroad, ambiguous and misleading because the trial court did not explain what wrongful conduct would justify a victim's response in this context. Reviewing this issue independently (*People v. Barber, supra,* 55 Cal.App.5th at p. 798), we are unpersuaded.

We are not aware of, nor does Brown cite, any authority stating that "wrongful conduct" (CALCRIM No. 571) has a technical legal definition in this context that "differs from its nonlegal meaning," such that a sua sponte instruction defining that term is required (*People v. Estrada* (1995)

13

11 Cal.4th 568, 574, italics omitted). Indeed, the California Supreme Court has repeatedly used the phrase "wrongful conduct" in describing the limits of imperfect self-defense without any suggestion that the term has a technical legal definition. (See, e.g., *People v. Rangel* (2016) 62 Cal.4th 1192, 1226; *People v. Enraca, supra,* 53 Cal.4th at p. 761; *People v. Valencia* (2008) 43 Cal.4th 268, 288.)

Nor does CACLCRIM No. 571 state that *any* wrongful conduct precludes imperfect self-defense. Instead, the instruction clarifies that a defendant falls outside the reach of imperfect self-defense only when a defendant's wrongful conduct "justif[ies] his adversary's use of force." (CACLCRIM No. 571.) As such, consistent with case law, the instruction narrows the type of wrongful conduct that excludes a defendant from the benefit of imperfect self-defense. (See, e.g., *People v. Rangel, supra,* 62 Cal.4th at p. 1226 [imperfect self-defense "may not . . . be invoked 'by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified' "].)

Moreover, the self-defense instructions informed the jury when a victim's response would be justified. The trial court told the jury that "[a] person who starts a fight has a right to self-defense" if that person tried to stop fighting and communicated that intent, and "the opponent continued to fight." The trial court explained that "if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent." The trial court

14

further instructed "[t]he right to use force in self-defense . . . continues only as long as the danger exists or reasonably appears to exist."

These instructions convey that a victim's justified response to an initial aggressor is limited to using like force against a present danger. A reasonable juror would apply these principles to imperfect self-defense because in addition to instructing the jury to correlate the instructions, the trial court informed the jury that the only difference between perfect and imperfect self-defense was the reasonableness of defendant's belief in the need to use deadly force.

Finally, counsel on both sides accurately explained the parameters of imperfect self-defense in their closing arguments. Arguing that Gallegos escalated a fistfight by trying to kill Brown with a box cutter, Defense counsel stated, "[t]he reaction to kill Mr. Brown is unlawful. And when that happens, Mr. Brown is allowed to respond with deadly force," "[y]ou can't simply assault somebody and give somebody the right to use deadly force." Regarding the disputed sentence in CALCRIM No. 571, defense counsel stated, "[j]ustify means legal," and "[w]e hear it all the time. You can't bring a knife to a fistfight, right?"

The prosecutor broke down possible scenarios for the jury, stating, "if the defendant used deadly force first, [Gallegos's] actions are justified, no self-defense. If the defendant used non-deadly force first and [Gallegos] responded with non-deadly force, right, Mr. Brown starts with punches, [Gallegos] responds with punches, that's self-defense. His actions are justified. No complete self-defense. No imperfect self-defense. Finally, if the defendant used non-deadly force first, and [Gallegos] used deadly force in response, because the defendant could have withdrawn, he gets no self-defense."

15

Based on the foregoing, the challenged portion of CALCRIM No. 571 correctly stated the law, and we do not find it overbroad, ambiguous or misleading under the circumstances of this case. We therefore see no error on this ground.

*E. The Trial Court Acted Within its Discretion in Excluding Testimony from Brown's Prison Expert*

1. Additional Background

Before trial, the court held an Evidence Code section 402 hearing to determine whether it would admit testimony from Brown's prison expert, Adam Mortera. Mortera testified, describing that since completing a 22-year prison sentence in 2013, he has provided various rehabilitative services for current and former prison inmates. Mortera explained prison culture, which involves strict rules about racial segregation, and respect, that inmates enforce on each other through violence. Former inmates retain prison culture upon release, and depending on the person they may shed that culture and adapt to life outside a prison setting. Mortera opined that if a Latino former inmate called an African-American former inmate the N-word or stole from or was blatantly disrespectful to the African-American former inmate, both parties would understand that conduct would give rise to a fight.

Analyzing Mortera's testimony, the trial court commented, "isn't that something that just the average person would know and that your client testifies[3] and he says when he called me the N-word, I reacted the way I reacted because of how long I was in prison. And in prison you get shanked for that, and that's how I was reacting. Why do I need an expert to tell me that a person who gets out of prison is affected by their life they led in

3    Brown acknowledged that he would testify before Mortera offered his opinion.

16

prison?"  The trial court also raised the potential for confusion, stating, "even I'm sitting here, knowing full well why we're here, I'm thinking, right, I have to remember my—to remind myself this incident didn't occur in prison."

Ultimately, the trial court found Mortera's testimony inadmissible, stating, "I don't think it is expert testimony.  I think it's common knowledge that prisons are violent.  And I don't think that he has any particularized expertise to testify that some people who come out of prison are still affected by that experience and might react differently than a person who hasn't been in prison.  I don't think that that is a matter that one needs expert testimony to understand.  [¶]  In addition, I think pursuant to . . . Evidence Code 352, . . . the prejudicial effect as in the confusion of the issues and the consumption of time is far outweighed by any probative value that his testimony could lend."

2.  Brown's Argument

Brown argues the trial court erred by excluding Mortera's testimony.  Pointing to Mortera's own incarceration and his training and work with prisoners since his release, Brown contends Mortera qualified as an expert on prisons and prisoners.  Brown claims Mortera's proposed testimony went beyond general knowledge regarding prisons and prisoners' ability to adapt after release, and was relevant to self-defense, provocation, and heat of passion.

3.  Analysis

Expert testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  (Evid. Code, § 801, subd. (a).)  As such, "[e]xpert testimony will be excluded ' " 'when it would add *nothing at all* to the jury's common fund of information.' " ' "  (*People v. Brown* (2016) 245 Cal.App.4th 140, 157.)  A trial

17

court also has discretion to exclude expert testimony when "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

"We review the trial court's ruling on the admissibility of expert testimony for abuse of discretion." (*People v. Brown, supra,* 245 Cal.App.4th at p. 157.) A trial court abuses its discretion when its ruling is " ' "so irrational or arbitrary that no reasonable person could agree with it." ' " (*Ibid.*)

Here, we agree with the trial court that prison violence is a matter of common knowledge. The trial court also accurately noted that a jury would not need assistance to understand that a person's experiences effect the way a person reacts, especially when Brown was anticipated to testify and justify his actions in part based on his prison history. (See, e.g., *People v. McDowell* (2012) 54 Cal.4th 395, 429 ["the trial court did not abuse its discretion in determining that the essence of the proffered expert opinion testimony, namely, that 'if you have a bad childhood it can affect you as an adult,' did not require expert opinion testimony"].) Accordingly, the trial court did not act irrationally or arbitrarily in determining that Mortera's proposed testimony was not sufficiently beyond the jury's common experience to warrant expert testimony.

Additionally, because Mortera addressed matters of common knowledge and Brown would testify to those matters based on his personal experience, the trial court had reason to conclude Mortera's testimony had limited probative value. Much of Mortera's testimony also addressed life in prison, while Brown's murder of Gallegos occurred outside of prison, supporting the

trial court's concern for confusion of the issues. Consequently, the trial court also had a rational basis for excluding the testimony under Evidence Code section 352.

Under these circumstances, the exclusion of Mortera's expert testimony was within the trial court's discretion.

## F.     *The Prosecutors Did Not Err or Violate the Racial Justice Act (RJA)*

The People sought to convict Brown of first degree murder on the theory that he killed Gallegos willfully and with premeditation and deliberation. To support that theory, in their opening and closing arguments the prosecutors used the words "hunt," "hunting," and "hunted" to describe Brown's actions. They also described the murder weapon as a "hunting knife."

Brown argues the prosecutors' characterization of Brown as an aggressor who hunted Gallegos violated the RJA and constituted prosecutorial error.[4] Brown contends "hunt" implies predatory activity, so the use of that word conveyed to the jury that Brown, an African-American, was a predator or a predatory animal or beast and that Gallegos was his prey. Brown claims the use of animal imagery is historically associated with racism, and the prosecutors' hunting references amounts to a racial epithet.

"A violation [of the RJA] is established if the defendant proves, by a preponderance of the evidence," that "[d]uring the defendant's trial, . . . an attorney in the case . . . used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or

---

[4]     Brown uses the term "prosecutorial misconduct," but that " 'is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853.)

19

animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (§ 745, subd. (a).) " 'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin." (§ 745, subd. (h)(4).)

Prosecutorial error, as a matter of state law, occurs when a prosecutor "engage[s] in deceptive or reprehensible tactics in order to persuade the trier of fact to convict." (*People v. Lightsey* (2012) 54 Cal.4th 668, 718.) A prosecutor's actions violate federal constitutional protections when there is "a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law." (*Ibid*.)

Hunting is a human behavior, especially when accomplished with a knife. Although animals also hunt, as Brown acknowledges, the prosecutors never called him a predator, animal, or beast. An objective observer would not interpret the prosecutors' use of the word "hunt" as appealing to racial bias, but rather as a characterization of the premeditated nature of Brown's actions. We therefore see no violation of the RJA and no prosecutorial error.[5]

---

[5]     Having found no error, we also reject Brown's claim of cumulative error.

## IV. DISPOSITION

The judgment is affirmed.


                                                    RUBIN, J.

WE CONCUR:


BUCHANAN, Acting P. J.


KELETY, J.